Peter T. Farrell, J.
By this motion, defendant seeks an order dismissing an indictment, with prejudice. His application is grounded on the District Attorney’s failure to bring him to trial thereon within 180 days after service, upon the prosecutor, of a notice of the place of defendant’s imprisonment — in the State of New Jersey — and a request for a final disposition of the indictment. The decision turns upon an interpretation of the pertinent provisions of the Interstate Agreement on Detainers, pursuant to which defendant’s notice and request was served. (New York Code Crim. Pro., § 669-b; N. J. Stat. Ann., §§ 2A :159A-l-A-15.)[1] Admittedly, the notice and request was received by the District Attorney of Queens County on May 21, 1959, but he did not secure temporary custody of the defendant nor bring him to trial within 180 days thereafter. The specific question is whether the prisoner’s effort to employ the procedure established by the Interstate Agreement was effectively frustrated— and the local District Attorney’s inaction excused— *388 by the New Jersey prison keeper’s omission to perform certain duties imposed upon him by the law, viz.: — (1) to accompany the notice and request by a certificate stating the term of commitment under which Esposito was being held in the New Jersey prison, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the State Parole Agency relating to the prisoner (Agreement, art. Ill, par. [a]); (2) to forward the notice, request and certificate to the prosecutor (and appropriate court) by registered or certified mail, return receipt requested {id., art. Ill, par. [b]); (3) to accompany the notice, request and certificate by an offer to deliver temporary custody of the prisoner to the local District Attorney, in order that a speedy and efficient prosecution might be had. {Id., art. V, par. [a].) I hold that, upon the facts of this case, the New Jersey Warden’s omissions did not defeat the defendant’s effort nor excuse the District Attorney’s failure to take timely and effective action in accordance with the provisions of the Interstate Agreement. Accordingly, the motion is granted.
The indictment — filed December 1,1958 — accuses the defendant (and another) of robbery, first degree, and related felonies. When so indicted, he was at liberty on a consolidated bail bond. Upon his appearance for arraignment on December 10,1958, the matter was put over for a week but, within that week, defendant was convicted of a crime in the State of New Jersey, was sentenced therefor, and commenced service of the term of imprisonment imposed by the New Jersey court. Consequently, he did not appear for arraignment upon the adjourned date. On January 15, 1959, the Director of the Division of Correction and Parole in the State of New Jersey sent to the Clerk of the County Court, Queens County, a copy of the Interstate Agreement on Detainers. His covering letter — referring specifically to this defendant — suggested that Esposito could be returned to face trial on the Queens County indictment in either one of two ways: ‘ ‘ The Court or your prosecutor can request temporary custody * * * under the provisions of Article IY * * or the prisoner himself can notify the Warden of the New Jersey State Prison of his desire to be taken out and tried promptly as provided for in Article III.”[2] No detainer based on the Queens *389 County indictment was then on file with the Warden of the New Jersey prison and, in fact, none was lodged with him until February 20, 1959. Nevertheless, on January 19, 1959, Esposito’s attorney sent to him, at the New Jersey State prison, a notice in duplicate, accompanied by a letter instructing the inmate to sign the notice and deliver it to the Warden who would then take the necessary steps to have Esposito returned to Queens for trial. The notice was to the effect that the defendant wished to be brought to trial on the Queens County indictment. There is no contradiction of Esposito’s sworn assertion that he followed these instructions, but there is no record of the receipt of any such notice by the District Attorney or the Clerk of the court. There is no evidence that the Warden took any action whatever with respect thereto.[3] And the defendant and his counsel let the matter rest in abeyance until May of 1959.
On the 8th of that month defendant’s counsel sent a letter to the Warden of the New Jersey State Reformatory, at Rahway, New Jersey, to which place defendant had, meanwhile, been transferred. With the letter there were two enclosures. The first was a copy of a letter sent by the attorney to Esposito, instructing the latter to sign and deliver to the Warden an enclosed “ letter ”, with the request that the Warden mail it to the District Attorney of Queens County, to whom it was addressed. The second enclosure was a copy of the ‘ ‘ letter ” just referred to. Actually, it was a notice of the place of Esposito’s imprisonment and a request for final disposition of the Queens County indictment, pursuant to the provisions of article III of the Agreement. It was dated May 11, 1959, and bore a footnote indicating that copies were forwarded, respectively, to the Warden of the New Jersey State Reformatory and to the County Court of Queens County, addressed in the latter case, to the Chief Clerk of the court. On May 12,1959, the Chief Clerk of the County Court received a copy of the counsel’s communication to the defendant, but there is no record of the receipt from the Warden of any copy of the prisoner’s notice and request. However, on May 21, 1959, the District Attorney received his copy from the Warden, but by ordinary mail, and unaccompanied by any certificate setting forth the term of the *390 commitment, etc. Moreover, the Warden did not forward therewith any offer to deliver temporary custody of the prisoner. On May 22, 1959, the District Attorney, by letter, requested the Warden to supply information as to the term of Esposito’s imprisonment, etc., and under date of May 28, 1959, adequate information on that subject was supplied, in letter form, by a New Jersey prison official. Thereupon, the District Attorney supplied the Clerk of the County Court with copies of defendant’s notice and request and of the letters passing between the District Attorney and the New Jersey prison officials. But the prosecutor initiated no proceeding to secure temporary custody of the defendant until October 27, 1959.
On that day one of his assistants procured a Judge of this court to certify and transmit to the Warden of the New Jersey State prison a request for temporary custody, in accordance with the provisions of article IV of the Interstate Agreement. In its first paragraph, the assistant alleged that Esposito, under date of May 14, 1959, had made a demand under section 669-b of the (New York) Code of Criminal Procedure, that the indictment be disposed of. “ With reference thereto ”, the assistant went on to supply basic particulars of the charges contained in the indictment; he stated that he proposed to bring the defendant before the Queens County Court for arraignment and trial at the earliest possible date and “ [i]n order that proceedings in this matter may properly be had ’ ’ he made the request for temporary custody. But the Warden did not respond with any offer of temporary custody in accordance with the provisions of article V of the Agreement, and the District Attorney let the matter rest until January 14, 1960. On that day he applied to another Judge of this court for a writ of habeas corpus, commanding the New Jersey prison official to produce the defendant, on a date specified, in the County Court of Queens County for arraignment and trial under the Queens County indictment. The application was denied because the Judge to whom it had been presented was of the opinion that the defendant then had an accrued right to a dismissal of the indictment. In that state of affairs, the issuance of the writ would not only have been a vain act but might very well have been interpreted as a judicial act of co-operation in an effort to evade the sanctions of the Interstate Agreement. On March 2, 1960, the defendant served his notice of the motion now before the court, together with the papers in its support. On March 23, 1960, the Warden of the New Jersey State prison acceded to the District Attorney’s request — made October 27,1959 — for temporary custody of the defendant. Consistently with that decision he supplied the *391 prosecutor with a certificate of the defendant’s inmate status, dated March 23, 1960 (showing the expiration date of the New Jersey commitment to be July 3, 1960) and, on the same day, delivered Esposito over to the agents of the District Attorney who brought him before the court, forthwith. Upon his part, the defendant then asserted his rights under the Interstate Agreement. His motion to dismiss the indictment was argued after a delay, directed by the court (at the District Attorney’s request), without prejudice to defendant’s existing rights. His arraignment on the indictment has been postponed until after the determination of this motion. The District Attorney’s opposition thereto is based upon a single premise.
He contends that Esposito’s notice and request was fatally defective by reason of the New Jersey Warden’s omissions, already outlined. Therefore (so he urges), it should be ignored as a nullity. Consequently (he continues), the District Attorney’s application of October 27,1959, constitutes the only action taken under the Interstate Agreement and, under its applicable provisions the indictment may not be dismissed unless he fails to commence defendant’s trial thereon within 120 days after the latter’s arrival in New York. (Art. IY, par. [c].) If that contention be correct the prisoner’s effort to invoke the interstate procedure can be defeated by ineptitude — or worse — at least to the extent that final disposition of the outstanding charges can be postponed indefinitely, by official confusion, compounded. Take this case as an example. The notice was received by the District Attorney on May 21,1959. If the 180-day period started running on that date it would expire on November 17,1959. But if the Warden’s inadvertence cancelled that notice, the District Attorney would have a period of 120 days from March 23, 1960 or, until July 21, 1960 to commence the trial unless, of course, the court, for good cause shown, should grant him a necessary or reasonable continuance. Without such a continuance the trial would begin 14 months after the prisoner’s notice had been received. By that view, this law has wax teeth and is little more than a legislative exercise in futility. I decline to so interpret it.
Its sanctions were meant to enforce its purpose and it is crystal clear that that conspicuous purpose is to hasten the final disposition of outstanding charges. By way of express declaration of that purpose it recites that: ‘ The party states find that charges outstanding against a prisoner, detainers based on untried indictments * * * and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation.” It is then further declared to be the *392 policy of the party States and the purpose of the Agreement, ‘ ‘ to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments ’ ’. Its further purpose — it goes on to say — is to provide co-operative procedures with reference to such charges and detainers when emanating from another jurisdiction. (Agreement, art. I.) Those whose studies and suggestions contributed to the proposals leading to the adoption of the agreement were, to be sure, primarily concerned with the planning and carrying out of programs for prisoner rehabilitation.[4] To them, delay in the disposition of outstanding charges was objectionable because it presented an obstacle to effective performance of their functions. A member of the legal profession would, more likely, regard it as objectionable because of its disservice to the prisoner’s right to a speedy trial (Code Grim. Pro., § 8), but the earlier drafts of proposed legislation expressed no concern with delay on that score.[5] However, a draft of article I was, eventually, broadened to include the purpose of a speedy trial[6] and, as already noted, security of that right is now specifically included as one of the declared purposes intended to be served by the statute. So the purpose is inescapable and, for its effectuation, the Agreement gives the prisoner the power of compulsion.
Paragraph (a) of article III provides that: ‘‘ Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer’s jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment # * provided that for good cause *393 shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.” Paragraph (c) of article V— so far as presently pertinent — provides that if the appropriate authority (here, the District Attorney of Queens County) refuse or fail to accept temporary custody of the prisoner, or in the event that an action on the indictment — on the basis of which the detainer was lodged — is not brought to trial within the period provided in article III, ‘ ‘ the appropriate court of the jurisdiction where the indictment * * * has been pending shall enter an order dismissing the same with prejudice, and any detainer based thereon shall cease to be of any force or effect. ’ ’ So drastic a penalty for inaction emphasizes, if that were necessary, the firmness of the legislative purpose to eliminate delay, for, under the older New York procedure, a dismissal for delay in prosecution was not a bar to another prosecution for the same offense, if a felony. (Code Grim. Pro., § 673.) It would be anomaly to hold that the statute, so firm in purpose, carries within it the seeds of the defeat of that purpose by the sort of official inadvertences which occurred in this case.
By mandate of the law: “All courts, departments, agencies, officers and employees of this state and its political subdivisions are hereby directed to enforce the agreement on detainers and to cooperate with one another and with other party states in enforcing the agreement and effectuating its purposes.” (Agreement, art. IX, par. 3.) Paragraph (c) of article III specifically directs that “ The warden * * * or other official having custody of the prisoner shall promptly inform him of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition of the indictment * * * on which the detainer is based.” Sensibly, adequate information as to the prisoner’s right to make the request would have to include intelligence as to the procedures to be followed in asserting it.[7] It goes without saying that the Warden himself was bound to know those procedures. Under the law — and with the guidance of the Warden — the prisoner has to do but one thing. In accordance with the provisions of paragraph (b) of article III of the agreement his notice and request “ shall be given or sent by the prisoner to the warden *394 * * * or other official having custody of him”. Otherwise, the burden of compliance with the requirements of the agreement is placed entirely upon the respective officials involved. Upon his part, the Warden is required to accompany the prisoner’s notice and request by his certificate, stating the term of the commitment, etc. (art. Ill, par. [a]) and to forward both papers “ promptly ”, to the appropriate prosecuting official and court, by registered or certified mail, return receipt requested (art. Ill, par. [b]). And the Warden should, at the same time, offer temporary custody of the prisoner to the appropriate authority in the State where the indictment is pending ‘ in order that speedy and efficient prosecution may be had.” (art. V, par. [a].) In the performance of these duties, the Warden has no discretion. Over their performance the prison inmate has no power of supervision. Neither, for that matter, has the District Attorney. But he is better situated to establish liaison with the prison official for the purpose of seeing that what should be done is done, in accordance with the requirements of the law. In any case, respect for the purpose of the agreement requires that the adverse consequences of such oversights as here occurred be visited upon the prosecution and not upon the prisoner. In that way the aim of the agreement is subserved by inspiring the officials concerned to gain knowledge of their duties and to perform them diligently and effectively. They are not likely to be so inspired if the prisoner is made the victim of their contributory inaction. There is, of course, no question as to the disposition of the officials in this case to honor the mandates of the law. But there has, obviously, been a failure to appreciate the range of duty and the procedure required by way of its performance. That is a not unusual incident of the adoption of a new and unfamiliar procedure. (See People v. Pershaec, 172 Misc. 324.) Indeed, it may have been in contemplation of just such possibilities that provision was included for an administrative officer (Agreement, art. IX, par. 6) in each State, to act jointly with his colleagues in the promulgation of rules and regulations to carry out more effectively the terms and provisions of the Agreement and to provide, within and without the State, information necessary to its effective operation, (Id., art. VII.) Time and experience will bring better understanding and co-operation between those in the chain of official responsibility. An embarrassment in one case will contribute to better performance in another. But unless performance is maintained as the standard of responsibility, a satisfactory appreciation of the measure of responsibility may not develop as soon as it should. Actually, the District Attorney displayed his awareness of his responsibility *395 in this case, but he did not press the Warden for all of the actions which the latter should have taken in compliance with the law. However that may be, the prosecutor was not really prejudiced by the omissions which occurred. Indeed, his sense of rightness repaired some of them.
Thus, although the Warden sent Esposito’s notice and request — dated May 11, 1959 — by ordinary mail, instead of by registered or certified mail, return receipt requested, there is no question that the District Attorney received it on May 21, 1959 and, although the Warden did not append his certificate as to the term of imprisonment, and so forth, the District Attorney requested and received, within a week, the information which the certificate would have supplied.[8] Although the Warden did not send a copy of the notice, request and certificate to the court, the District Attorney filed copies of the notice and supplementary correspondence with the court. And although the Warden did not accompany the notice and request with an offer of temporary custody both he and the District Attorney were bound to know that the law required him to do so and, if need be, the prosecutor should also have called the Warden’s attention to that omission. I hold, therefore, that the notice and request was effective to assert the defendant’s rights under the agreement. It was, therefore, incumbent upon the District Attorney to proceed accordingly.
The notice and request was deemed to be a waiver, by the prisoner, of extradition to the State of New York for a final disposition of the Queens County charge, a like waiver to serve any sentence imposed in the event of his conviction and, in general, a consent to the production of his body in any court where his presence might be required to effectuate the purpose of the agreement. (Agreement, art. Ill, par. [e].) In response to the request — and to the Warden’s offer — all that the District Attorney had to do was to signify his acceptance of the offer to the official making it, and present evidence of his identification and authority, along with a certified copy of the indictment. (Id., art. V, par. [b].) It would thereupon have been lawful and mandatory upon the Warden to give over the person of the *396 defendant, to the District Attorney. (Id., art. IX, par. 5.) [9] The procedure contemplated by article IV is required to be followed only when the request for temporary custody originates with the District Attorney. It cannot be used to parry a prior notice and request by the prisoner, nor to avoid the consequences of failure to comply with the law, after the inmate has given or sent his notice and request to the Warden. As for the application made to another Judge of the court (George P. Stier) in January of 1960, for a writ of habeas corpus, I share the opinion which impelled him to deny it. The defendant then had an accrued right to a dismissal of the indictment, with prejudice, because of the District Attorney’s failure to bring him to trial thereon within the statutory period. He has preserved that right and is, therefore, entitled to the relief sought by the present motion. An order accordingly is made herewith.

. The statute will hereafter be referred to as the “ Agreement ”. The States now parties thereto are: Connecticut (Gen. Stat., tit. 54, ch. 965, §§ 54-186-54-192, eff. date not shown, enacted, 1957, Public Act No. 404, S-1 to S-7); New Hampshire (Rev. Stat. Ann., §§ 606-A:1-A:6, eff. July 17, 1959); New Jersey (Stat. Ann., §§ 2A :159A-1-A-15, eff. April 18, 1958); New York (Code Crim. Pro., § 669-b, eff. Sept. 1, 1957) and Pennsylvania (Purdon’s Pa. Stat. Ann., tit. 19, §§ 1431-1438, eff. Sept. 8,1959).

. The reference was, of course, only to the procedures established by the Agreement. The availability of other means of securing temporary custody was not at issue. (See N. Y. Code Crim. Pro., § 832; N. J. Stat. Ann., § 2A:160 — 33; Rau v. McCorkle, 45 N. J. Super. 191, 196, 197 and authorities there cited; Ponzi v. Fessenden, 258 U. S. 254. In the Federal jurisdiction, see U. S. Code, tit. 18, § 4085.)

. The Warden may have interpreted the provisions of the Agreement as giving the prisoner no right to serve a notice and request — and hence, as creating no duty upon his part to mail it — until the lodging of a detainer based on the outstanding indictment. (See art. Ill, pars, [a], [b], [c], [d], art. IV, par. [a], art. V, par. [b], el. [2], and art. V, par. [d].) I so hold. Accordingly, the notice of January 19, 1959 is of no importance except so far as it should have inspired an awareness of the duties which followed its delivery to the Warden, in a proper case.

. See Report of the Joint Committee on Detainers (1948). In 1955, “upon the recommendation of the New York Joint Legislative Committee on Interstate Cooperation, the Council of State Governments undertook to revive informally the machinery of the old joint committee approach for a fresh look at the problem.” (Minutes of Special Committee Meeting Sponsored by the Council of State Governments and the New York Joint Legislative Committee on Interstate Cooperation, Nov. 25,1955, p. 2.)

. See article I (p. 4) of the proposals before the Special Committee at its meeting of November 25, 1955, and article I (p. 3) of the proposals before it on February 10, 1956.

. See Minutes of Special Committee Meeting, February 10, 1956, p. 3.

. This requirement was not embodied in the earlier draft. The Special Committee, at its meeting of February 10, 1956 (Minutes, p. 3), directed Dr. Mitchell Wendell (Research Consultant to the New York State Joint Legislative Committee) “to add language making it mandatory for the warden to notify the prisoner of detainers * *' • and of his privileges under the act.” The State of New Jersey was represented at that meeting. (Minutes, p. 1.)

. Delegates to a Joint Conference were concerned with a possibility that the Warden’s failure to attach the material enumerated in the intrastate act (Our Code Grim. Pro., § 669-a, subd. 1) might void the request. The significant language of the Interstate Compact is the same. But the whole purpose of the certificate seems to have been to assure the District Attorney of sufficient information to enable him to make an intelligent decision as to whether to “ drop the detainer immediately, without additional correspondence back and forth.” (See Minutes of Joint Conference on Legislation Dealing With Detainers, etc., April 14, 1956, p. 2.)

. An imperfect understanding of official duty might well be cured by requesting the good offices of the State administrative officer. In this ease, any difficulty might have been overcome more directly, by communication with Mr. Bixby, the Director of the Division of Correction and Parole, of the Department of Institutions and Agencies in New Jersey. He was present at the meeting of the Special Committee on February 10, 1956 (Registration List, Minutes, p. 1) and his representatives attended the meetings of Nov. 25, 1955 (Reg. List, Minutes, p. 1) and April 14,1956 (Reg. List, Minutes, pp. 1, 2).