UNITED STATES of America, Appellee,

v.

William BRYANT, Appellant.

No. 78–5222.

United States Court of Appeals, Fourth Circuit.

Argued May 11, 1979.

Decided Oct. 30, 1979.

Joseph W. Grier, III, Charlotte, N.C., for appellant.

Phillip Kelley, Asst. U. S. Atty., Charlotte, N.C. (Harold M. Edwards, U. S. Atty.,

and Harold J. Bender, Asst. U. S. Atty., Charlotte, N.C., on brief), for appellee.

Before WINTER, BUTZNER and PHILLIPS, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Convicted by a jury on five counts of receiving and possessing stolen postal money orders, 18 U.S.C. § 500, Bryant appealed assigning as errors a fatal variance in his indictment; instructions to the jury on the element of recent possession; and violation of rights secured by the Interstate Agreement on Detainers Act. Finding no reversible error, we affirm the judgment of the district court.

### I.

Fourteen blank postal money order forms were stolen from a New York post office on October 30, 1973. An unlawful entry occurred at a Baltimore, Maryland post office, with no loss discovered, in March 1977. A validating plate for the blank postal money orders was reported missing from another Baltimore post office on April 9, 1977. Six postal money orders were cashed in Charlotte, North Carolina, on April 16 and 18 of that year, having the numbers of the stolen blank forms, bearing the number of the stolen validating plate, and having been validated on a machine in the unlawfully-entered Baltimore post office. An expert witness for the U.S. Post Office identified the palm prints on the six money orders, in the writing position, and a latent fingerprint on one, as those of defendant Bryant.

Bryant was indicted in the Eastern District of North Carolina for receiving and possessing a stolen postal money order, and that district lodged a detainer with the State of Maryland, where Bryant was in custody for an unrelated state offense, on March 27, 1978. Bryant then was indicted in the Western District of North Carolina for receipt and possession of the six "U.S. Postal money order[s]" that had been "embezzled, stolen and converted," the charge from which the instant appeal comes, on

June 5, 1978. The Western District issued a writ of habeas corpus ad prosequendum to Maryland authorities on July 13 without having filed a detainer. Defendant was delivered into the temporary custody of the Western District six days later. Scheduled for trial on August 8, he requested and was granted a continuance. After denial of his motion challenging the court's jurisdiction for alleged violation of the Interstate Agreement on Detainers Act, he was tried to a jury on August 22, 1978, convicted, and this appeal followed.

### II.

We first address the suggested violation of the Interstate Agreement on Detainers Act, 18 U.S.C. App. A (Supp.1979) (the Act).

In its critical provisions, this Act creates a method for a prosecutor to secure the presence of a prisoner of another jurisdiction by lodging a detainer and requesting custody. 18 U.S.C.A. App. A, at art. IV. It also provides a procedure for a prisoner against whom a detainer has been filed to accelerate final disposition of the charges. Id. art. III. To speed along disposition of charges, it generally requires trial to begin within 120 days of the prisoner's arrival pursuant to a prosecutor's detainer and request, or within 180 days of a prisoner's request. Id. arts. IV(c), III(a). Further, it directs notice to be given by the custodial state to all appropriate officers and courts of the receiving jurisdiction that lodged the detainer, and requires dismissal of any charges issued in the receiving jurisdiction before the prisoner's return to custody and "contemplated hereby." Id. art. IV(e); see id. art. III(d). Finally, the provision at issue here states that after a prosecutor has filed a detainer and a request "there shall be a period of thirty days after receipt by the appropriate authorities before the request be honored, within which period the Governor of the sending State may disapprove the request for temporary custody or availability . . . ." Id. art. IV(a). It has now been established by judicial decision that, after the lodging of a detainer, the issuance of a writ of habeas corpus ad

prosequendum operates as a request under the Act for temporary custody or availability, *United States v. Mauro*, 436 U.S. 340, 363, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978); *Brown v. Mitchell*, 598 F.2d 835, 836 (4th Cir. 1979), to the extent the writ is for "prosecution on the charge or charges . . which form the basis of the detainer . . or . . . aris[e] out of the same transaction," 18 U.S.C.A. App. A, at art. V(d).

Bryant contends that the Act applies to his transfer and that its provision for a thirty-day period was violated by his transfer to federal custody within six days after issuance of the Western District's writ of habeas corpus ad prosequendum. For the Act to apply, the Western District's writ must be considered to have operated in conjunction with the Eastern District's earlier detainer to trigger the Act under the *Mauro* interpretation. This raises a serious preliminary question which we need not address here [1] because we conclude that, in any event, the Act's thirty-day provision would not have been violated here if the Act did apply.

■ We interpret the thirty-day period to be a maximum period for a state's action on a request following a detainer and not a minimum period during which a state cannot yield custody. The actual language of the Act, that "there shall be a period of thirty days . . . before the request be honored, within which period the Governor of the sending State may disapprove the request," *id.* art. IV(a), means that *no more than* thirty days are allowed during which a *disapproval* will be countenanced rather than that *at least* thirty days must elapse before the sending state may *approve* and

make the transfer. The stated purpose of the Act, "to encourage the expeditious and orderly disposition of [outstanding] charges . . .," *id.* art. I, is served by a construction that accelerates the possible trial date. *See also United States v. Mauro*, 436 U.S. at 351, 98 S.Ct. 1834. The remainder of Article IV also demands this construction, because it explicitly provides that "such delivery [of a prisoner] may not be opposed or denied on the ground that the executive authority of the sending State has not affirmatively consented to or ordered such delivery." *Id.* art. IV(d).

■ Even if the thirty-day period were a mandatory waiting period when set in motion, we believe that it does not apply to federal writs of habeas corpus ad prosequendum that follows detainers. The Interstate Agreement on Detainers was designed for cooperation between individual states, and was only recently joined by the United States, without amendment. While an individual state has authority to disapprove another state's request for custody, it does not have authority and is not empowered by the Act to reject a federal writ of habeas corpus ad prosequendum that serves as such a request, as the Supreme Court noted in *Mauro*. *United States v. Mauro*, 436 U.S. at 363, 98 S.Ct. 1834. While the thirty-day period applies to state requests and to other federal "requests" for custody or availability that do not have operative effect in themselves, *see id.* at 360, 98 S.Ct. 1834, it does not apply to a request in the form of a federal writ of habeas corpus ad prosequendum that follows a detainer and that is immediately legally effective; so this period was not violated in the instant case in any event.

---

1. The Act defines a "State" as including "the United States of America." 18 U.S.C.A. App., at art. II(a). Hence the filing of a detainer by one federal district followed by the issuance of a writ of habeas corpus ad prosequendum by another district on the same charge or transaction underlying the detainer, *id.* art. V(d), might be thought to activate the Act's several requirements. *See United States v. Krohn*, 558 F.2d 390, 392 (8th Cir. 1977); *United States v. Cappucci*, 342 F.Supp. 790, 793 (E.D.Pa.1972). On the other hand, the Act was drafted for use by the individual states and was only subsequently

joined by the United States, with no explicit legislative acknowledgment that the detainer of one federal district and the subsequent writ of another on the same charge or transaction would invoke the Act. The district judge in this case concluded, "it's hard for me to believe that where any [federal] district in the land files a detainer, . . . then that would . . make [the Detainers Act] effective to all the other 90-some-odd districts in the land. That's a little bit broader than I believe the Congress intended . . . .." Jt. App. 14–15. We reserve decision on the point.

## III.

Bryant next contends that his indictment for receiving or possessing six "U.S. Postal money order[s]," knowing that they had been embezzled, stolen and converted, did not state the statutory offense of receiving or possessing "any blank money order form." 18 U.S.C. § 500. We agree with Bryant that the statutory term "any such money order" refers to the phrase "any blank money order form" in the preceding paragraph, but we believe that the money order charged to his possession was a "blank" money order form within contemplation of the statute. The gravamen of the offense defined in the seventh unnumbered paragraph of 18 U.S.C. § 500 as literally charged to Bryant in the indictment and sufficiently proved on trial is the possession or receipt with requisite intent of a money order form known by the possessor to have entered illegal traffic in "blank" form. That it may to some extent have lost its blank form when he received it, or that he himself may have altered it from its original blank form is immaterial to charge or proof of this possessory offense. We conclude that the indictment did not vary fatally from the statutory offense, because "each essential element of the offense [was] alleged together with sufficient additional facts to allow the indictment to be used as proof in bar of a subsequent prosecution for the same offense" and "to apprise the defendant of the charge against him so that he may prepare his defense." *United States v. Duncan*, 598 F.2d 839, 848 (4th Cir. 1979).

## IV.

Finally, Bryant argues that the jury instructions on recent possession were erroneous, because the blank money orders had been stolen three and one half years before they were validated and cashed so that his possession was not recent enough to permit an inference of his knowledge of their stolen character. Bryant did not raise this objection at trial or propose a conflicting instruction and may not raise it here initially. Fed.R.Crim.P. 30; *Satterfield v.*

*Zahradnick*, 572 F.2d 443, 446 (4th Cir. 1978). In any event, the money orders were illegally validated only seven and nine days before he cashed them so that the instructions properly charged recent possession. *United States v. Sahadi*, 292 F.2d 565 (2d Cir. 1961).

*AFFIRMED.*

WINTER, Circuit Judge, dissenting:

I respectfully dissent. An essential element of the crimes of which Bryant was convicted is the blank character of the converted money orders. In my view, the government failed to allege and to prove that Bryant possessed blank money orders. I would therefore reverse defendant's convictions because each count of the indictment was legally insufficient to charge the crime of which he was convicted and the proof was legally insufficient to show a violation of the statute on which each count of the indictment was purportedly based.

## I.

Defendant was convicted upon each of five counts of an indictment charging a violation of 18 U.S.C. § 500. That section consists of a number of unnumbered paragraphs, the sixth and seventh of which were added by Congress in 1972. They read:

[Sixth] Whoever embezzles, steals, or knowingly converts to his own use or to the use of another, or without authority converts or disposes of *any blank money order form* provided by or under the authority of the Post Office Department or Postal Service; or

[Seventh] Whoever receives or possesses *any such money order form* with the intent to convert it to his own use or gain or use or gain of another knowing it to have been embezzled, stolen or converted . . . [shall be fined or imprisoned]. (Italics added.)

In its brief to us, the government concedes that each count of the indictment was based upon the seventh paragraph of § 500, set forth above. The majority and I are agreed that the phrase "any such money order" in this paragraph means "any blank

money order form" described in the preceding sixth paragraph. Yet no count of the indictment mentions a "blank money order form." Count One is typical of them all; the rest differ only as to the dates charged and the serial number of the money order allegedly possessed. Count One charges:

That on or about [date] at Charlotte, Mecklenburg County, within the Western District of North Carolina,

WILLIAM BRYANT

did unlawfully and wilfully have in his possession, with intent to convert to his own use or gain or to the gain or use of another, U.S. Postal Money Order No. [serial number], in the amount of $300.00, made payable to Alfred M. Toland, with the purchaser shown as Edith Toland, and bearing validation plate No. 90704, which had been embezzled, stolen and converted from and out of the custody of the U.S. Postal Service, WILLIAM BRYANT well knowing at the time that the said money order had been so embezzled, stolen and converted, in violation of Title 18, United States Code, Section 500.

Each count thus shows on its face that it fails to charge the possession of a blank money order form. Indeed, each charges possession of a money order purportedly complete.

The majority deems the money order "blank" even after it was illegally validated, stressing that the gravamen of the crime is knowledge on the part of the possessor that the money order was "blank" when it entered illegal traffic. I think that the legislative history of the portions of § 500 with which we are concerned make it perfectly plain that the statute was intended to encompass only money orders which lacked validating and completing data. To me it would follow that the counts of the indictment must be legally insufficient, because those counts only allege possession of facially complete money orders; under the majority's own view, the money orders ceased to be "blank" when they were filled out.

The best discussion of congressional intent is contained in Sen.Rep.No.92–1074, 92d Cong., 2 Sess. (1972), *reprinted in* [1972] U.S.Code Cong. & Admin.News, p. 3356. The section analysis of that report states: "The seventh paragraph [of § 500 as amended by the bill] is new and covers the receipt or possession of a *blank* money order form with an intent of converting it for use or gain with knowledge that the form was embezzled, stolen, or converted." [1972] U.S.Code Cong. & Admin.News at 3358 (emphasis added). Another passage from the report, *id.* at 3357–58, addresses the concerns that prompted Congress to amend § 500, and clearly indicates that the seventh paragraph deals only with blank money order forms:

Present section 500 of title 18, United States Code, does not proscribe illicit trafficking in blank postal money orders. Additionally, the statute does not draw within its purview the processing machines which are the media of issuance for postal money orders. H.R. 9222, as amended, will cure these two basic ills in the current statutory scheme . . . . .

The Postal Inspection Service today faces serious problems in attempting to block traffic by professional criminals in money orders stolen in blank in post office burglaries. . . .

\* \* \* \* \* \*

As noted above, section 500 in its current form does not reach money order blanks. Specifically, the problem is that section 500 now contains no "possession" clause with respect to blank orders or validating equipment. Since section 500 does not now cover this criminal activity, U.S. attorneys must base prosecutions upon other statutes. Principal reliance is placed on section 641 of title 18, United States Code . . . . However, section 641 requires that the "value" of the property be demonstrated. . . . In prosecutions under section 641, difficulty has been experienced in establishing, to a court's satisfaction, the actual value of a blank money order. This feature has hindered the Government's efforts to file

felony charges against professional money order fences under section 641. The criminal activities of the fences are regarded as most serious in that without their active presence, burglars would find blank money orders less attractive as a burglary objective. . . .

Because to me the legislative history demonstrates so overwhelmingly that the seventh paragraph of § 500 proscribes only the receipt and possession of certain *blank* money order forms and none of the five counts of the indictment charge that defendant possessed "blank" money order forms, I think that this is a proper case for application of the rule, venerable in this circuit, that:

It is elementary that every ingredient of the crime must be charged in the bill, a general reference to the provisions of the statute being insufficient . . . [T]he defect in this count of the indictment is by no means a technical defect, but, as the record shows, was but one expression of a fundamental misconception as to the law applicable to the offense therein charged.

*Hale v. United States*, 89 F.2d 578, 579–80 (4 Cir. 1937). As in *Hale*, the indictment in the instant case does not suffer from a mere technical insufficiency. It fails to allege activity that constitutes a criminal offense under the law cited. *See also United States v. Pomponio*, 517 F.2d 460, 463 (4 Cir. 1975). On the authority of these cases, I would dismiss the indictment.

An indictment must contain a "plain, concise, and definite written statement of the essential facts constituting the crime charged." F.R.Crim.P. 7(c). The majority correctly points out that the requirement of a complete indictment ensures that the defendant is apprised of the charges against him so that he can prepare a proper defense, and serves as a bar against subsequent prosecution. But these constitute only two of the three functions served by an indictment listed by the Supreme Court in *Hagner v. United States*, 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861 (1932):

The true test of the sufficiency of an indictment is . . . whether it contains the elements of the offense intended to be charged, *and* 'sufficiently apprises the defendant of what he must be prepared to meet, and . . . to what extent he may plead a former acquittal or conviction.' *Cochran v. United States*, 157 U.S. 286, 290, 15 S.Ct. 628, 39 L.Ed. 704, 705 (emphasis added).

It is not enough to show that the defendant in this case was not prejudiced by the form of the indictment; "The questions whether an indictment sufficiently apprises a defendant of the charges against him and whether an indictment states an offense are both conceptually and procedurally distinct." *United States v. London*, 550 F.2d 206, 211 (5 Cir. 1977).

## II.

Under my view of the elements required to be shown to establish guilt under the applicable portion of § 500, and, I submit, even under the majority's view of what § 500 proscribes, I think that the proof was legally insufficient to show guilt beyond a reasonable doubt.

The government's case was sketchy. Five postal money orders, made payable to Alfred M. Toland and showing the purchaser as Edith Toland, were introduced into evidence. It was shown that each money order was endorsed with Alfred M. Toland's name on the back and that each had been cashed with a post office or merchant in Charlotte during April 1977. Blank postal money order forms bearing the same serial numbers as these forms had been stolen from Lefferts Postal Station in Brooklyn on October 30, 1973. The five forms in evidence had been validated on a machine located in Merchants Finance Station in Baltimore. That station had been burglarized with no apparent loss on March 26 or 27, 1977. The validation number on the five forms was the same as that of a validation plate which was reported missing from Clifton-Eastend station in Baltimore on April 9, 1977.

The only evidence linking Bryant in any way to these money orders was the testimony of a fingerprint expert, who stated that he discovered on the back of each money order the palm print of Bryant "in a writing position." Thus, the evidence showed that Bryant endorsed the name of Alfred M. Toland on the back of each money order. But nothing in the evidence indicated that Bryant possessed a blank money order form or that he completed a blank money order form. For all that the evidence showed, the face of each money order could have been filled in with the names of the payee and the purchaser before Bryant ever came into possession of them. Thus, in my view, Bryant's motion for a directed acquittal should have been granted.

I call attention also to the fact that the proof was legally insufficient to prove the crime even under the majority's view of the statute. If, as the majority holds, an element of the crime is proof that the possessor of the money order had knowledge that it had "entered illegal traffic in 'blank' form," there was no direct proof of that element or any other proof from which the requisite knowledge could be inferred. The motion for acquittal should have been granted under the majority's view also.

### III.

As I view this case, the government simply misconceived what the seventh paragraph of § 500 was intended to proscribe, and it was therefore deficient in drafting an indictment and in producing proof. Bryant has unquestionably committed a crime, but I think that the crime was one of forging an endorsement in violation of the second paragraph of § 500 * or of receiving stolen government property under 18 U.S.C. § 641. It was not the crime mistakenly charged in the instant case.

---

\* 18 U.S.C. § 500

　　[Second] Whoever forges or counterfeits
　　. . . any material signature or indorse-

ment [on any U.S. postal money order] [shall be fined or imprisoned].