UNITED STATES of America, Appellee,

v.

Joel Robert SCHEER, Appellant.

No. 521, Docket 83–1308.

United States Court of Appeals,
Second Circuit.

Argued Dec. 13, 1983.
Decided Feb. 24, 1984.

Barry E. Griffith, Rutland, Vt., for appellant.

Holly K. Harris, Asst. U.S. Atty., Rutland, Vt. (George W.F. Cook, U.S. Atty., D. Vt., Peter W. Hall, Asst. U.S. Atty., Rutland, Vt. of counsel), for appellee.

Before MESKILL, KEARSE and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

Joel R. Scheer, a prisoner held under state charges in California, was transferred to the State of Vermont to answer federal charges. The transfer was made under the Interstate Agreement on Detainers Act (IADA or Act), 18 U.S.C. App., pp. 545–48; (1982); Pub.L. 91–538, §§ 1–8, 84 Stat. 1397–1403 (1970). Scheer claims on this appeal that his motion to dismiss the federal indictment in Vermont should have been granted because his rights under the Act were violated. He asserts that he was not brought .to trial within 120 days of his arrival in Vermont, that a certificate setting forth the terms of his commitment, time served, time remaining to be served and the like was not furnished by the State of California and that his transfer was effected less than 30 days after receipt of a request for it. This appeal follows a judgment of conviction entered in the United States District Court for the District of Vermont (Coffrin, C.J.) pursuant to a written plea agreement, under which Scheer reserved the right to appeal the denial of his dismissal motion for the claimed violations of the Act. We turn to the facts, which are not in dispute.

I

On January 14, 1982 a federal grand jury in Vermont handed down a six count indictment charging Scheer, a previously convicted felon, with various violations of the federal firearm statutes. On March 15, 1982 Scheer was arrested in California on state charges under the name of Randolph Bachman. While Scheer was in jail awaiting disposition of those charges, federal authorities discovered his whereabouts and in April filed a detainer with the Los Angeles County Jail on the federal charges pending against him in Vermont. On May 27

Scheer pled guilty to grand theft in California and was sentenced to 16 months imprisonment, with credit for time served of 109 days. With the state charges resolved, Scheer contacted the United States Attorney's office in Vermont and requested a prompt resolution of the outstanding federal charges. He also sent a telegram on June 7 to the same office stating that he "would appreciate if you could clear the problems up as expediently as possible."

On May 28, 1982 the government filed a petition for a writ of *habeas corpus ad prosequendum* requesting that the court have the defendant brought to Vermont. Judge Holden issued the writ on June 1 directing that defendant be brought before him for arraignment. On June 5 United States Marshals took custody of the defendant, shuttled him across the country and delivered him in the District of Vermont on June 25, where he was immediately arraigned. Judge Holden set July 9 as the deadline for filing pretrial motions and August 2 as a tentative trial date. Defendant was represented at the arraignment by retained counsel, who moved on July 6 to withdraw. At a hearing on the motion on July 8, and upon defendant's request for an additional two weeks in which to retain another attorney, Judge Holden granted retained counsel's motion to withdraw, appointed counsel to represent the defendant, and extended the time for the defendant to file pretrial motions until July 23.

On July 23 defendant filed two motions to suppress, alleging that his arrest and the search of his residence giving rise to the federal charges were illegal. Hearings were scheduled on these motions for August 6. On August 3 the defendant filed a motion, which was granted the next day, for a continuance in order to obtain a transcript of his prior state court proceedings. The transcript was obtained and filed one week later and the suppression hearing was scheduled for August 27. To accommodate defense counsel's schedule, the hearing was later rescheduled for September 3, when testimony was taken. At the defendant's request, the hearing was ad-

journed until September 13 to take further testimony. At its conclusion both parties were told to submit proposed findings. Defendant filed his papers on September 28, and the government's memoranda were filed on October 4. On October 4 the government filed a motion to reopen the evidence on the suppression issues. The defendant filed opposition papers, and a hearing on the motion was held on October 20. After entertaining oral argument, and in the presence of the defendant, the court granted the government's motion to reopen the record. On October 28 the court denied defendant's motions to suppress.

Since Judge Holden was engaged in a protracted civil trial, he decided on November 17 to transfer this case to Judge Coffrin for trial, scheduled to begin on December 8. But on December 1 and 7 the defendant asked the court *ex parte* to issue subpoenas for certain individuals to ensure their availability as witnesses. After a hearing, with defendant present, the applications were granted and the trial date was continued until January 11, 1983. On January 5 the defendant sought another continuance because one of his witnesses had been hospitalized and one of the subpoenas had not been served. Scheer indicated at the time that his need for a continuance to secure these witnesses outweighed his interest in a speedy trial. By order dated January 10 the court granted defendant's request and set the trial date for February 8.

On January 28 the defendant moved to dismiss the indictment claiming that the government had violated certain provisions of the Interstate Agreement on Detainers Act. Judge Coffrin continued the trial from February 8 to a date subsequent to the disposition of this motion, which he heard and denied on March 2. Immediately thereafter a jury trial commenced. Following a guilty verdict, Judge Coffrin, for evidentiary reasons, granted defendant a new trial. Prior to the commencement of the second trial defendant entered a plea of guilty to two counts of the federal indictment. Under the plea agreement, he reserved his right to this appeal.

## II

Before discussing the issues it is helpful to examine the circumstances surrounding the passage of the Interstate Agreement on Detainers Act. The Act contains no definition of detainer, but the Senate Report recommending enactment of the Agreement defines it to be "a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." S.Rep. No. 1356, 91st Cong., 2d Sess. 2 (1970), *reprinted in* 1970 U.S.Code Cong. & Ad.News 4864, 4865. The Act was entered into by the United States in order to provide a prisoner with a method of clearing up detainers filed against him and to provide prosecutors with a uniform set of rules governing temporary transfers for purposes of trial. Born because of abuses arising from the ease of filing detainers, which prejudiced the prisoner against whom they were lodged, the Act was conceived upon the premise that justice demanded prompt disposition of such detainers. The Director of the Bureau of Prisons advised Congress that lodging a detainer against a prisoner seriously disadvantages him in several ways. Since he is in custody, he is unable to organize a defense to the charges related in the detainer. He is prejudiced in the eyes of those who hold him because the detainer indicates criminal proclivity on his part making him ineligible for desirable work assignments. Interest in rehabilitation tends to evaporate when a person confined in one jurisdiction has unresolved charges pending in another. *See* 116 Cong. Rec. 13,999 (1970). Once one jurisdiction had tried and convicted a prisoner, another jurisdiction without any requirement of judicial oversight would simply file a detainer against the prisoner, instead of moving to extradite and try him on charges. Upon the prisoner's completion of the first term, a second jurisdiction could then bring the prisoner to trial. And, if the prisoner was convicted in the second jurisdiction, still other jurisdictions seeking to press charges

might file detainers with the prison where he was next incarcerated. *See generally United States v. Ford*, 550 F.2d 732 (2d Cir.1977), *aff'd sub. nom., United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978).

It was against this backdrop of abuse that the Joint Committee on Detainers worked out a statement of principles which later served as the underpinnings of the Act. These principles were directed at those authorities that file detainers—prosecutors, prison, law enforcement and parole officials—and provided that:

1. Every effort should be made to accomplish the disposition of detainers as promptly as possible.

2. There should be assurance that any prisoner released to stand trial in another jurisdiction will be returned to the institution from which he was released.

3. Prison and parole authorities should take prompt action to settle detainers which have been filed by them.

4. No prisoner should be penalized because of a detainer pending against him unless a thorough investigation of the detainer has been made and it has been found valid.

5. All jurisdictions should observe the principles of interstate comity in the settlement of detainers, and each should bear its own proper burden of the expenses and effort involved in disposing of the charges and settling detainers.

*See* J. Bennett, *The Last Full Ounce*, 23 Fed.Probation 20, 22 (June 1959).

Congress passed the Act into law without opposition and with little discussion. *See* 116 Cong.Rec. 13,997–14,000, 38,840–38,842 (1970). The findings and purposes of the Act are set forth in Section 2, Article I. In finding "that charges outstanding against a prisoner, detainers based on untried indictments, informations, or complaints and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treat-ment and rehabilitation," the Act states as its purpose "to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints." 18 U.S.C.App., p. 545 (1982). Article I also states that the purpose of the agreement is to provide cooperative procedures for the disposition of such charges and detainers. *Id.*

Article III provides the procedures for the prisoner to initiate a request for the disposition of detainers lodged against him. Article IV, with which we are concerned, governs requests initiated by the prosecutor and provides the means by which the government can secure the presence of a prisoner in another jurisdiction to dispose of outstanding charges against him. Article IV(c) states:

In respect of any proceeding made possible by this article, trial shall be commenced within one hundred and twenty days of the arrival of the prisoner in the receiving State, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

After a prosecutor has filed a detainer and a request, Article IV(a) provides that "there shall be a period of thirty days after receipt by the appropriate authorities before the request be honored, within which period the Governor of the sending State may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner." Article IV(b) further provides that "the appropriate authorities having the prisoner in custody shall furnish the officer [of the receiving state] with a certificate stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the State parole agency relating to the prisoner." These three subdivisions—(a), (b) and (c)—

of Article IV, which defendant Scheer claims were violated in this case, will be discussed in reverse order.

### III

We turn first to Article IV(c) of the Act and Scheer's claim that he was not brought to trial within the 120 day period. Defendant and the government agree that a total of 249 days elapsed between June 25, 1982—the date Scheer arrived in Vermont—and March 2, 1983, the date his trial commenced. Scheer argues that, notwithstanding the fact that some of the elapsed 249 days were attributable to his requests, the 120 day time limit was exceeded. He concedes that the 62 days from December 8, 1982 to February 8, 1983 occasioned by continuances he sought to obtain witnesses for trial should be charged to him, but maintains that the remaining 187 days were all chargeable to the government, thereby clearly violating the 120 day statutory period. The government asserts that there were 77 other days, in addition to the 62 conceded days, properly chargeable to defendant and that this total of 139 days when subtracted from the total of 249 indicates Scheer was brought to trial within the statutory time period.

In ruling on the motion to dismiss, Judge Coffrin engaged in the following analysis: he charged the defendant with one week (7 days) from July 16–23 for an enlargement of time for filing of defense motions because of defendant's change of counsel; 21 days from August 6–27 when the suppression hearing was continued to obtain a state court transcript; 7 days from August 27 to September 3 to accomodate the rescheduling request of defense counsel; 21 days from September 3 to September 24, the date the suppression hearing commenced to the date the court set for filing of memoranda; 30 days from September 28 to October 28, from the filing of defendant's memoranda until the ruling on the

motions. The total of these days charged to defendant, including the 62 conceded, amounts to 148 days, which also indicates defendant was timely brought to trial.

Article VI of the IADA provides as follows:

'(a) In determining the duration and expiration dates of the time periods provided in articles III and IV of this agreement, the running of said time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter.'

Thus, in computing whether or not the requirements of Article IV(c) have been satisfied, it is appropriate to exclude all those periods of delay occasioned by the defendant. *See, e.g., Bush v. Muncy,* 659 F.2d 402, 408–09 at n. 4 (4th Cir.1981), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1259, 71 L.Ed.2d 449 (1982); *United States v. Black,* 609 F.2d 1330, 1334–35 (9th Cir. 1979), *cert. denied,* 449 U.S. 847, 101 S.Ct. 132, 66 L.Ed.2d 56 (1980). Upon our review of the record, we conclude that nearly all of the claimed delays found by Judge Coffrin in this case were directly attributable to various defense motions. The defendant asked for additional time to procure an attorney, to suppress evidence and to procure a state transcript. He requested continuances based on the unavailability of his witnesses and moved that the court allow these witnesses to be subpoenaed. Considering that the defendant requested these delays solely for his benefit, we are unpersuaded that his rights under Article IV(c) of the Act were violated.[1] *See Foran v. Metz,* 463 F.Supp. 1088, 1097–98 (S.D.N. Y.), *aff'd mem.,* 603 F.2d 212 (2d Cir.), *cert. denied,* 444 U.S. 830, 100 S.Ct. 58, 62 L.Ed.2d 38 (1979) (courts need not "decide defense motions immediately upon filing on pain of dismissal of the indictment for delay"). *See also State v. Finley,* 277 S.C.

---

1. In this connection, we were informed at oral argument that the district court had not been made aware of the applicability of the Act until the defendant moved for dismissal under its provisions. Notwithstanding that Article IV(c) was unavailing to the defendant in this case, in future cases the United States Attorney should advise the court early in the proceedings of the applicability of the IADA.

548, 290 S.E.2d 808, 809 (1982) (where defendant's motion is cause of the delay, he cannot expect dismissal of the charges because the case was not tried within 120 days); *State v. Vaughn,* 296 N.C. 167, 250 S.E.2d 210 (1978), *cert. denied,* 441 U.S. 935, 99 S.Ct. 2060, 60 L.Ed.2d 665 (1979) (request that trial be continued to secure witnesses constituted waiver of 120 day period); *People v. Grubbs,* 39 Colo.App. 436, 570 P.2d 1299 (1977) (delays incurred with defendant's acquiescence or as accommodation to him were not included in calculating 120 day period).

The defendant's reliance on *Stroble v. Anderson,* 587 F.2d 830 (6th Cir.1978), *cert. denied,* 440 U.S. 940, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979), is misplaced. In *Stroble* the court held that good cause was not shown in open court for the continuances granted to the prosecutor by the court in the absence of defense counsel's knowledge. *Id.* at 839. In contrast, Scheer was present with his counsel in court and involved in the planning of his defense strategy which included instigating many of the delays referred to earlier. Since the orderly administration of justice required that defendant's motions be heard and determined prior to the commencement of the trial, we conclude that the requirements of Article IV(c) were satisfied in this case.

## IV

■ The defendant next asserts that the indictment should have been dismissed because the California authorities did not timely furnish a certificate detailing the terms of his commitment. According to the defendant, he was "in federal custody for thirteen months, not knowing and unable to learn the status of his overriding California sentence," and claims that he would have been able to do a variety of things had the certificate been timely forwarded. This claim is without merit.

As noted, Article IV(b) requires a sending jurisdiction to furnish specific information about the defendant's history to the receiving jurisdiction. The purpose of requiring such a certificate is to assure that the prosecutor and the court have sufficient factual information regarding the prisoner to make an informed decision as to how best to proceed with the case. In order to do that the information must be in the hands of the receiving state in timely fashion. Subdivision (b) is silent as to the precise timing. In that connection, the statute also contains a scrivener's error when it states that the certificate shall be furnished "[u]pon request of the ... request," when plainly what is intended is that it be forwarded "[u]pon *receipt* of the ... request." Inasmuch as the IADA's focus is on prompt disposition of detainers, ordinarily the certificate should arrive in the receiving state no later than the prisoner. Although the California officials did not timely furnish such a certificate to the federal authorities, the defendant contacted the federal officials promptly after being sentenced in California and sought an expedited resolution of his case in Vermont. Since no evidence was offered that the defendant was unaware of the terms of his own sentence, his current claim of ignorance is unworthy of belief. Further, since the California report was available to the district court at the time of the defendant's sentencing on the federal charges, we cannot conclude that the purposes of the Act were in any way frustrated.

Defendant's reliance on *People v. Esposito,* 37 Misc.2d 386, 201 N.Y.S.2d 83 (Queens County Ct.1960), and *People v. Lincoln,* 42 Colo.App. 512, 601 P.2d 641 (1979), misses the mark. In *Esposito,* the dismissal occurred because the prosecutor's untimely failure to act after the prisoner had requested disposition of the charges was not excused by the lack of a certificate. Here, of course, the prosecutor moved swiftly—and in accordance with the prisoner's request—even in the absence of a certificate. In *Lincoln* the question was whether a sending state properly notified the prisoner of any detainers lodged against him and his right to request the prompt disposition of the underlying charges. Unlike *Lincoln,* here there is no question that Scheer was well aware of the charges lodged against him in Vermont.

Significantly, it was that awareness which prompted him to contact the Vermont authorities and request the speedy disposition of such charges. Hence, under the circumstances of this case, we conclude that the district court was correct in refusing to dismiss the indictment under Article IV(b).

## V

The defendant's final challenge revolves around the district court's refusal to dismiss the indictment under Article IV(a) of the Act. Defendant maintains in substance that he was transferred too soon after the California authorities received the writ of *habeas corpus ad prosequendum*, and alleges that his transfer prior to the expiration of the 30 day period violated his rights by not affording him sufficient time to challenge the writ.

The 30-day period was plainly inserted into the law to permit the prisoner to object or the Governor of the sending state to order that the prisoner not be transferred. 116 Cong.Rec. 14,000, 38,841. Although it could be argued that this proviso applies only to the "State" parties to the Agreement and not to the United States, that position is difficult to justify since the definition of "State" in the Act includes the United States. What little legislative history exists indicates that the United States and the District of Columbia became full parties to the Detainer Agreement with the States "so that *all jurisdictions will have uniform and simplified rules for the disposition of detainers and the exchange of prisoners.*" *Id.* at 38,841 (emphasis supplied). More significantly, the Supreme Court has indicated that Article IV(a) envisions that following the filing of a written notice of request for custody "[f]or the next 30 days, the prisoner and prosecutor must wait while the Governor of the sending State, on his own motion or that of the prisoner, decides whether to disapprove the request." *Cuyler v. Adams,* 449 U.S. 433, 444, 101 S.Ct. 703, 710, 66 L.Ed.2d 641 (1981).

■ The government urges that we hold the 30-day period not violated because the

writ of *habeas corpus ad prosequendum* was not abrogated by the United States becoming a party to the Act. We recognize that the historic power of a federal court to issue such a writ to secure a state prisoner for federal trial has existed since Chief Justice Marshall held it was included under the rubric of *habeas corpus* in *Ex Parte Bollman,* 8 U.S. (4 Cranch) 75, 2 L.Ed. 554 (1807). Nonetheless, employing that rationale would be treating the federal government's participation in the IADA on a different footing than that of the States. Further, the Supreme Court has held that once a detainer has been lodged, as here, it triggers the procedural rules of the Act so that the later filing of a writ of *habeas corpus ad prosequendum* is simply equivalent to a "written request for temporary custody" and may not be used as a basis for the federal government to avoid its obligations under the Act. *United States v. Mauro, supra,* 436 U.S. at 362, 98 S.Ct. at 1848. Thus, the historic power of the writ seems unavailing once the government elects to file a detainer in the course of obtaining a state prisoner's presence for disposition of federal charges.

■ We believe a more solid ground for rejecting defendant's challenge may be found in his waiver of the 30-day period. The Act sets forth statutory rules relating to procedures to be followed in prisoner transfer. But these procedural rules are not rights guaranteed by the Constitution. Inasmuch as the IADA " 'has appropriately been characterized as a statutory right to a speedy trial,' " *see United States v. Odom,* 674 F.2d 228, 230 (4th Cir.) (*quoting Bush v. Muncy, supra,* 659 F.2d at 406–07 n. 2), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2946, 73 L.Ed.2d 1341 (1982), a defendant may waive the time limitations imposed under it. *See United States v. Odom, supra; United States v. Black, supra,* 609 F.2d at 1334; *United States v. Eaddy,* 595 F.2d 341, 344 (6th Cir.1979); *Camp v. United States,* 587 F.2d 397, 399–400 (8th Cir. 1978); *United States v. Ford, supra,* 550 F.2d at 742; *cf. People v. White,* 33 A.D.2d 217, 221, 305 N.Y.S.2d 875, 879 (N.Y.1969)

(a prisoner "may not continue to participate in the proceedings indefinitely and then, at his pleasure, demand and be granted a dismissal of the indictment."). Some courts have found waivers of the Act when there is proof that a prisoner affirmatively requests to be treated in a manner contrary to the Act's procedures. *See United States v. Odom, supra; United States v. Eaddy, supra,* 595 F.2d at 344. Under similar circumstances other courts have held that a defendant is estopped from invoking the Act. *See Gray v. Benson,* 608 F.2d 825 (10th Cir.1979), *aff'g* 458 F.Supp. 1209 (D.Kan.1978); *United States v. Scallion,* 548 F.2d 1168 (5th Cir.1977), *cert. denied,* 436 U.S. 943, 98 S.Ct. 2844, 56 L.Ed.2d 784 (1978).

The purposes for which the 30-day period was included in the Act clearly are not frustrated by a finding of a waiver in this case. If anything, those purposes wholly justify such a finding. Article IV(a) gives the governor of the sending State authority to disapprove a transfer request on his own motion. Thus, one policy underlying the 30-day period is the preservation of states' rights to refuse extradition.[2] *United States v. Ford, supra,* 550 F.2d at 741. But California did not object to the procedures followed by the federal district court in Vermont, nor did it object to Scheer's transfer having taken place within the 30-day period. We doubt that Scheer's real concern was for the rights of the sending State. He argues mainly his own rights.

Reliance on a *prisoner's* rights to contest a transfer—another purpose of Article IV(a)—is the real basis of Scheer's challenge. Common sense suggests that a prisoner will only make such a motion when he opposes transfer. Further, Article III of the IADA, under which the prisoner (as opposed to the receiving state in Article IV) initiates the request for transfer, contains no provision comparable to a 30-day waiting period. This omission implies that the drafters of the Act did not

deem the 30-day period necessary for those prisoners who advocate their transfer. Accordingly, despite the fact that this case was handled under the rubric of Article IV, not Article III, the defendant unquestionably favored an expeditious transfer. He twice contacted federal authorities in Vermont, once by telephone and later by telegram, and in these contacts expressly requested that his problems be cleared up "as expediently as possible." Far from challenging his transfer, Scheer was urging it. Thus, while we fully recognize the duty of courts under Article IX liberally to interpret the IADA to ensure and preserve rights that prisoners are entitled to, the Act should not be construed to sanction the impossible. No prisoner can ask the court to speed disposition of the out-of-state charges against him today, and to delay them tomorrow.

When viewed in this light, *Cuyler v. Adams, supra,* does not support defendant's position. In *Cuyler* the prisoner actively sought to *prevent* his transfer and the court interpreted the Act as preserving the right of a prisoner to a pre-transfer hearing under the provisions of the Uniform Criminal Extradition Act. Here, of course, inasmuch as one of the stated purposes of the Act is "to encourage the expeditious and orderly disposition of [outstanding] charges," that purpose was well served by the defendant's prompt transfer to Vermont. *See United States v. Graham,* 622 F.2d 57, 59–60 (3d Cir.), *cert. denied,* 449 U.S. 904, 101 S.Ct. 278, 66 L.Ed.2d 135 (1980); *United States v. Bryant,* 612 F.2d 799, 802 (4th Cir.1979), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1855, 64 L.Ed.2d 274 (1980). In fact, it is plain, as this case illustrates, that the salutary purposes of the Act may be short-circuited by playing off the thrust of the Act for prompt disposition of detainers against the delay of 30 days in Article IV(a). Scheer may not press for prompt disposition of his outstanding federal detainer and later be permitted successfully to argue that the Act

---

**2.** We harbor some doubt as to the importance of this purpose inasmuch as Article III has no comparable 30-day waiting period. A sending State's policy reasons for preventing transfer of a prisoner would seem as strong under Article III as they are under Article IV.

172

grants him a stay of 30 days. Instead, we view his initial requests for prompt disposition of the federal detainer as a waiver of the 30 day period and therefore conclude that the district court correctly denied the motion to dismiss Scheer's indictment under Article IV(a).

For all these reasons, the judgment is affirmed.

KEARSE, Circuit Judge, concurring:

I concur in the result and in most of the majority opinion. I do not, however, subscribe to the majority's view that in light of Article IV(a) of the Interstate Agreement on Detainers Act, 18 U.S.C.App., pp. 545, 546 (1982),

the historic power of the writ [of habeas corpus *ad prosequendum*] seems unavailing once the government elects to file a detainer in the course of obtaining a state prisoner's presence for disposition of federal charges.

Majority Opinion, *ante* at 170. In my view, this obiter proposition is debatable. *See United States v. Mauro,* 436 U.S. 340, 363, 98 S.Ct. 1834, 1848–49, 56 L.Ed.2d 329 (1978):

The proviso of Art. IV(a) does not purport to augment the State's authority to dishonor such a writ. As the history of the provision makes clear, it was meant to do no more than preserve previously existing rights of the sending States, not to expand them. If a State has never had authority to dishonor an *ad prosequendum* writ issued by a federal court, then this provision could not be read as providing such authority.

(Footnote omitted.)