UNITED STATES of America, Appellee,

v.

William BRYANT, Appellant.

No. 79–5021.

United States Court of Appeals, Fourth Circuit.

Argued Aug. 22, 1979.

Decided Dec. 4, 1979.

---

Daniel T. Blue, Jr., Raleigh, N. C. (Thigpen, Blue & Stephens, Raleigh, N. C., on brief), for appellant.

Jack B. Crawley, Jr., Asst. U. S. Atty., Raleigh, N. C. (George M. Anderson, U. S. Atty., Raleigh, N. C., on brief), for appellee.

Before BUTZNER, HALL and PHILLIPS, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

William L. Bryant appeals his conviction in the United States District Court for the Eastern District of North Carolina for receipt and possession of a stolen money order. 18 U.S.C. § 500. On this appeal he assigns errors under the Interstate Agreement on Detainers Act and the Speedy Trial Act, challenges the venue of the trial court, and contends that the evidence was insufficient to support his conviction. Finding no prejudicial error, we affirm.

I

Fourteen blank postal money orders were stolen from a New York post office on October 30, 1973. One of these was cashed by appellant Bryant in Raleigh, North Carolina, in April 1977; the postal employee who cashed the money order could not identify the payee but testified that he had presented a Connecticut or New Jersey driver's license or similar identification bearing the name Alfred M. Toland. Bryant had been arrested in Baltimore, Maryland, on October 31, 1973, and had had in his possession a Connecticut driver's license or similar identification bearing the name Alfred M. Toland. Bryant's latent palm print was detected on the postal money order by a fingerprint specialist after the money order was cashed in Raleigh, and his hand had been in the writing position and its print was beneath the two endorsements.

On March 20, 1978, Bryant was indicted in the Eastern District of North Carolina for receipt and possession of a stolen postal money order knowing it to have been stolen, embezzled, or converted, 18 U.S.C. § 500. Seven days later, a detainer was filed by that district with the State of Maryland, where Bryant was in custody on unrelated state charges, and a writ of habeas corpus ad prosequendum was issued to Maryland on May 18 but cancelled on May 27 before Bryant was transferred, because of state proceedings in Maryland. On June 5, 1978, Bryant was indicted in the Western District of North Carolina for six other counts of knowing receipt and possession of stolen postal money orders, and a writ of habeas corpus ad prosequendum, but no detainer, was issued to Maryland by that district. Appellant was brought to the Western District in July and was tried and convicted on five of the six counts there in August 1978, then was returned to Maryland's custody. A new writ of habeas corpus ad prosequendum was then issued by the Eastern District on September 13, 1978. Bryant was brought back into North Carolina fourteen days later, arraigned on October 5 and convicted in a jury trial on October 24 of that year. This appeal followed.

## II

Bryant argues that the government's failure to bring him to trial in the Eastern District of North Carolina before returning him to state custody after his trial in the Western District of North Carolina requires dismissal of the indictment in the Eastern District under the Interstate Agreement on Detainers Act, 18 U.S.C. App. A (the Act). That Act requires that, when a "State" obtains temporary custody or availability for trial of another state's prisoner by lodging a detainer and making a request therefor, "[i]f trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment . . . the court shall enter an order dismissing the same with prejudice." *Id.* art. IV(e). If the two federal districts are part of the same "State" for purposes of obtaining state prisoners under the Detainers Act, because trial was not held on the Eastern District's indictment before the prisoner's return to state custody following the Western District trial, the Eastern District must dismiss the charge against Bryant. This, contends Bryant is the proper interpretation of the Act, and this the result compelled. The issue thus presented is one of first impression in this court.[1]

It is an issue that was not, and could not have been, anticipated when the United States joined the Interstate Agreement on Detainers. The Agreement had been drafted for participation by individual states of the Union. When the United States subsequently entered the Agreement, its terms were not amended because the Justice Department (and presumably Congress as well) simply assumed that the Act only applied to the federal government in a sending capacity and not in a receiving capacity, because a writ of habeas corpus ad prosequendum already provided a method

to obtain state prisoners for federal trial. *See United States v. Mauro,* 436 U.S. 340, 355, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978). It was only when the Act was construed in *Mauro* nearly eight years later to apply to the federal government in a receiving capacity as well, *id.* at 353–56, 98 S.Ct. 1834, that the question before us became practically possible. While on its face the Act could be read to define the entire United States as a single receiving "State," 18 U.S. C.A. App. A, at art. II(a), we must interpret it under a rule of reason that takes into account the circumstances of its enactment and any probably unforeseen change of legal circumstances bearing upon its application after enactment. *See* R. Dickerson, *The Interpretation and Application of Statutes* 120–22, 125–31 (1975).

In undertaking construction of the Act on this basis, we start with the unchallengeable proposition that as originally drafted for application only among the several states of the Union, the Act must have contemplated "separate geographic and distinct jurisdictional units" when it used the term "State." *See United States v. Umbrower,* 602 F.2d 754 (5th Cir. 1979). Various intended workings of the Act clearly illustrate this. The prime example of course is the basic assumption on which the Act operates: that it will ordinarily involve a shorter period of temporary custody by a receiving state if a prisoner is taken from any point in the receiving state to any other point in that state before returning him to a custodial state than if he is taken from the receiving state to the custodial state then back to the receiving state.[2] A fundamental purpose of the Act is precisely to encourage minimum interruption in rehabilitative programs at the place of "original imprisonment" and to avoid harassment by uncoordinated shuttling of prisoners back and forth between custodial states and oth-

---

1. We specifically avoided addressing it in Bryant's appeal from his conviction in the Western District trial. *United States v. Bryant,* 612 F.2d 799, 802 n.1 (No. 78–5222, 4th Cir. 1979).

2. Not of course always. There are undoubtedly geographical relationships between the several states in which an intermediate return to an adjacent sending state might involve a shorter overall trip. But the generality is clearly true and certainly provided an operating assumption for drafters of the original Act.

er states in which multiple related charges may be pending.[3] The assumption that this will usually be accomplished under the Act simply breaks down if the whole of the United States is considered a receiving "state" vis-a-vis any of the separate states of the Union as a sending state.[4] Perhaps even more significant is the working assumption clearly built into the Act that a receiving state as a jurisdictional unit will have a routine method of monitoring under centralized control the arrival of out-of-state prisoners for trial on particular charges anywhere within the jurisdictional unit defined as "State." This makes realistic the requirement that all related pending charges in the "State" be tried before return of a prisoner to the state of original imprisonment. This assumption also simply breaks down if "State" is interpreted to encompass the whole territory of the United States whenever a state prisoner is received for trial in any federal district of the United States.[5]

■ These basic assumptions, that the unit defined as "State" will have a geographical expanse less extensive than the territorial expanse of the entire United States, and that it will have a formal and effective means of monitoring the arrival of out-of-"State" prisoners for trial in any of its courts, must therefore be seen as indispensible to the Act's proper functioning. Awareness of this must be imputed to the Congress that brought the federal judicial system within the Act's coverage. Transposed to the federal system, it is clear that these indispensible attributes are most readily, and perhaps only, realizable if the geographical and jurisdictional unit defined as "state" is considered to be the federal district.

■ We accordingly hold that when, as here, a federal district court obtains a state prisoner for trial under circumstances invoking the Act, only that district is deemed a "State" within contemplation of the Act.[6] Accordingly, the failure of the United States District Court for the Eastern District of North Carolina to try Bryant prior to his return to Maryland's custody following trial in the Western District of North Carolina on similar charges does not require dismissal of the Eastern District indictment.

We are confident that other safeguards than the Act are available to prevent abuses that could conceivably arise from treating federal districts as separate "States" when receiving prisoners from state custody under circumstances that invoke the Act's protections.[7]

3. *See, e. g., United States v. Chico*, 558 F.2d 1047 (2d Cir. 1977).

4. *E. g.*, Maryland state prison to Maryland federal district court, to California federal district court, to Maryland prison.

5. While a federal system for notice to all United States Attorneys of a detainer's filing by any federal district is certainly a technological and administrative possibility, none apparently now exists. Even if it did the geographical considerations would remain as effective impediments to the intended operation of the Act as between the individual states.

6. This does not speak to the situation in which a federal prisoner is procured by writ for federal trial in another district than that of his confinement. Speaking to that situation, at least two federal courts have held the Act not violated because the entire United States and the federal government is to be considered one

"State" for intra-system transfers of custody. *United States v. Krohn*, 558 F.2d 390, 392 (8th Cir. 1977); *United States v. Cappucci*, 342 F.Supp. 790, 793 (E.D.Pa.1972). Defendant here would find support in those decisions for his contention that "state" means the entire United States and the federal government at large in the situation at bar. We reject this for two reasons. First, it is not the same situation, and the requirement of statutory construction that we face does not dictate analogous treatment of the two even if we accepted the validity of those constructions. Secondly, if faced with the exact problem confronted in those decisions, we might be more disposed to say that the Act was simply not intended to apply at all to intra-federal system transfers than that, as applied, it should be so construed.

7. Bryant also argues that the government's failure to bring him to trial in the district court below within 120 days of its lodging of a de-

## III

Bryant contends that the six and one half month delay between his indictment and his arraignment before the Eastern District violated the Speedy Trial Act, 18 U.S.C. § 3161 et seq., and consequently required dismissal of the indictment. This Act requires that "the arraignment of a defendant charged in an . . . indictment with the commission of an offense shall be held within ten days from the filing date (and making public) of the . . . indictment, or from the date a defendant has been ordered held to answer and has appeared before a judicial officer of the court. in which such charge is pending whichever date last occurs." *Id.* § 3161(c). If the time limit is violated, the Act authorizes,[8] with certain exceptions, dismissal of the indictment on motion of the defendant. *Id.* § 3162(a)(2). Although Bryant was indicted on March 20, 1978, he did not appear before any judicial officer of the Eastern District of North Carolina until after he was brought there on September 27, and he was arraigned within ten days on October 5 as the Speedy Trial Act requires. Furthermore, Bryant's initial arraignment date in May 1978 was postponed because of conflicting state court proceedings that constituted "trials with respect to other charges against the defendant," and his arraignment was further delayed by his petition for habeas corpus, received by the district judge on July 18 and denied on August 2, that constituted a "proceeding concerning the defendant [that was] actually under advisement," both of which are excluded from the time computation under the Speedy Trial Act. *Id.* § 3161(h)(1)(C), (G).

Bryant further insists that the Eastern District did not obtain his presence for trial with sufficient promptness, emphasizing that the Western District transferred him from state custody, arraigned him, and tried him during the July and August term before his Eastern District trial. The Speedy Trial Act also requires that, "[i]f the attorney for the Government knows that a person charged with an offense is serving a term of imprisonment in any penal institution, he shall promptly—(A) undertake to obtain the presence of the prisoner for trial; or (B) cause a detainer to be filed with the person having custody," and after lodging a detainer and receiving notice that the prisoner demands a speedy trial, "the attorney for the Government shall promptly seek to obtain the presence of the prisoner for trial." *Id.* § 3161(j)(1), (3). Here the government did file a detainer, but Bryant did not demand a speedy trial, and in fact sought to delay that trial. The standard for "promptly" obtaining the prisoner's presence for trial is established by the Plans for Achieving Prompt Disposition of Criminal Cases adopted by individual federal districts pursuant to the Speedy Trial Act, and the government in obtaining Bryant's presence

tainer and its issuance of the writ of habeas corpus ad prosequendum on May 18, 1978 (that was cancelled nine days later), without good cause for the delay, violated the Interstate Agreement on Detainers Act. But the Act requires that "trial shall be commenced within one hundred and twenty days of the *arrival* of the prisoner in the receiving State," 18 U.S.C. App. A, at art. IV(c) (emphasis added), not 120 days from the making of a request for temporary custody, and that requirement was met in this case. Bryant quotes the Supreme Court's language in *Mauro* that this provision requires "commencement of trial within 120 days whenever the receiving State initiates the disposition of charges underlying a detainer it has previously lodged . . . ." 436 U.S. at 364, 98

S.Ct. at 1849. But the Court did not purport to alter the statutory language that the "disposition of charges" begins only after the prisoner's arrival. Moreover, Bryant could have brought rapid execution of the indictment underlying the detainer under the Act, 18 U.S.C.A. App. A, at art. III, but instead delayed his transfer from state custody for trial, *see* part III *infra*. *See Fells v. Kansas*, 343 F.Supp. 678, 680 (D.Kan. 1972); *Commonwealth v. Fasano*, —— Mass. App. ——, 375 N.E.2d 361 (1978).

**8.** A sanction of mandatory dismissal will go into effect on July 1, 1980. 18 U.S.C. § 3163(c) as amended S. 961, 96th Cong., 1st Sess., 125 Cong.Rec. 6912. Until then the decision to dismiss is discretionary.

complied with the requirements of the Eastern District plan.

## IV

 Bryant asserts that the government did not establish a prima facie case against him in that it failed to adduce evidence of three elements of a violation of 18 U.S.C. § 500: (1) receipt and possession of a blank money order, (2) an intent to convert it for his own use or gain, and (3) knowledge of the stolen, embezzled, or converted character of the money order. But (1) that he had received and possessed the money order when blank could be inferred from the location of his palm prints beneath its two endorsements and in the writing position. *United States v. Bryant,* 612 F.2d 799, No. 78–5222 (4th Cir. 1979). (2) That he intended to convert it could be inferred from the same evidence along with his prior possession of a driver's license or similar identification bearing the payee's name. And (3) that he knew of its stolen character could be inferred from the same evidence.

He also contends that the case against him did not sufficiently establish venue. But there was sufficient evidence that he cashed the money order in Raleigh, North Carolina, within the Eastern District.

*AFFIRMED.*