John Claude BUSH, Appellant,

v.

R. M. MUNCY; Superintendent P.C.C.; Attorney General for the State of Maryland, Appellees.

No. 78–6388.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 10, 1980.

Decided Sept. 4, 1981.

Paul Kaleta, Third Year Law Student (Michael E. Geltner and Larry J. Ritchie, Georgetown University Law Center, Washington, D. C., on brief), for appellant.

Stephen N. Rosenbaum, Asst. Atty. Gen., Baltimore, Md (Stephen H. Sachs, Atty. Gen. of Maryland, Bonnie Travieso, Asst. Atty. Gen., Baltimore, Md., on brief), for appellee Atty. Gen. of Maryland.

Guy W. Horsley, Jr., Asst. Atty. Gen., Richmond, Va. (Marshall Coleman, Atty. Gen., of Virginia, Richmond, Va., on brief), for appellee Muncy.

Before HAYNSWORTH and BRYAN, Senior Circuit Judges, and PHILLIPS, Circuit Judge.

JAMES DICKSON PHILLIPS, Circuit Judge:

John Claude Bush appeals the denial by summary judgment of his claims for habeas corpus relief under 28 U.S.C. § 2254 and for injunctive and monetary relief under 42 U.S.C. § 1983 for alleged violation by Maryland and Virginia officials of federal rights secured to him by the Interstate Agreement on Detainers (IAD).[1] We hold that there was no violation of the IAD entitling him to habeas corpus relief under section 2254, but that his section 1983 claims should not have been denied as to all defendants by summary judgment. Accordingly, we affirm in part, and reverse and remand in part for further proceedings on the section 1983 claim.

I

On June 4, 1975, Bush was charged in Virginia with unlawful possession of drugs. On June 10, 1975, authorities of Anne Arundel County, Maryland filed a detainer against him, and similar action was taken by authorities of Prince George's County, Maryland on June 27, 1975. Bush pleaded guilty to the Virginia charge on September 16, 1975, and was sentenced to a term of imprisonment at Virginia's Powhatan Correctional Center, where the two Maryland detainers remained lodged against him while he served his sentence.

On November 17, 1975, Bush was taken to Prince George's County, Maryland for trial, but, upon the granting of a continuance requested by the Maryland authorities, he was returned at his own request to Virginia to await trial. He was again taken to Prince George's County, Maryland on February 17, 1976, at which time he stood trial and was acquitted of the charges lodged against him in that county. Despite the requirement of article IV(b) of the IAD that the appropriate authorities of the send-

---

1. The IAD was promulgated by the Council of State Governments about 1957, see *Davidson v. State*, 18 Md.App. 61, 61 n.1, 305 A.2d 474, 476 n.1 (1973), and has since been adopted by forty-eight states and by Congress on behalf of the United States and the District of Columbia, see 84 Stat. 1397 (1970). The purpose of the IAD is to provide a common procedure for the disposition of detainers between states to avoid, as much as possible, the disruption of a prisoner's course of rehabilitation and a prisoner's anxiety with regard to charges pending against him in other states. *See, e. g., United States v. Bryant*, 612 F.2d 806, 809–10 (4th Cir. 1979); *Hoss v. State*, 266 Md. 136, 142–44, 292 A.2d 48, 52–53 (1972); *State v. Lippolis*, 107 N.J.Su-

per. 137, 143–44, 257 A.2d 705, 709–10 (App. Div.1969). To effectuate these common goals, all contracting jurisdictions have enacted a group of substantially identical basic provisions. For convenience, reference to these common provisions in this opinion will therefore be by citation to the version of the IAD adopted by Congress. *See* 18 U.S.C. App. § 2. In addition all party states, including both Maryland, *see* Md.Code Ann. art. 27, §§ 616K–616R, and Virginia, *see* Va.Code §§ 53–304.2 to –304.8, have enacted certain provisions that are "supplemental" to the basic provisions of the IAD. Specific reference will be made as necessary to a "supplementary" provision of the Maryland version that is critical to this appeal.

ing state are to notify "all other officers and appropriate courts in the receiving State who have lodged detainers against the prisoner" of the request for custody of the prisoner by another officer of the receiving state who has lodged a detainer against the prisoner, *see* 18 U.S.C. App. § 2, art. IV(b), there is no indication in the record that any Virginia official ever notified the Anne Arundel County authorities of Bush's impending transfers to Prince George's County to stand trial, or that the Anne Arundel County authorities otherwise had knowledge of Bush's presence in Maryland prior to his return to Virginia following trial on the Prince George's County charges.

After his acquittal in Prince George's County, Bush was returned to prison in Virginia on March 1, 1976. On April 13, 1976, however, Anne Arundel County authorities requested that Bush be delivered to their custody for trial on the charges still pending against him in that county. Bush wrote Powhatan Correctional Center Superintendent Muncy and Virginia Assistant Attorney General O'Hare, the Virginia official apparently charged with administering the IAD, and objected to this transfer. His letter asserted that the Anne Arundel County charges against him should have been dismissed because, in violation of article IV(e) of the IAD, *see* 18 U.S.C. App. § 2, art. IV(e), he had not been tried on all pending Maryland charges on which detainers had been lodged prior to his return to Virginia following his trial on the Prince George's County charges. O'Hare communicated Bush's objection to Virginia Governor Godwin, but advised the governor that Bush's objection was one properly addressed to the Maryland courts and that it should not preclude his transfer from Virginia.

Bush then filed this action, proceeding *pro se*, in the United States District Court for the Eastern District of Virginia. His complaint sought relief in the form of dismissal of the Anne Arundel County charges, removal of the detainer against him on those charges and a restraining order preventing his transfer to Maryland. Despite the pendency of this action, the

Virginia prison officials transferred Bush to Anne Arundel County, Maryland, on July 6, 1976. There he was tried and convicted on the outstanding Maryland charges. After imposition of sentences totalling seventeen years on these charges, Bush was returned to Virginia for completion of his term of imprisonment in that state. On June 12, 1977, Virginia paroled Bush to Maryland, where he is now imprisoned.

Bush appealed his conviction on the Anne Arundel County charges to the Maryland Court of Special Appeals, contending that his trial on those charges was in violation of the trial-before-return rule of article IV(e) of the IAD. The Court of Special Appeals affirmed the conviction. Virginia officials had not complied with article IV(b) of the IAD and notified Anne Arundel County authorities of the request for transfer of the Prince George's County authorities. Under a special "supplementary" provision of Maryland's version of the IAD, *Md.Ann. Code* art. 27, § 616Q, the trial-before-return obligation of article IV(e) arises only if Maryland officials who have lodged detainers have actual notice of such a request prior to a prisoner's return to his state of custody. Because in Bush's case they had no such notice, the court held that the IAD was not violated by his trial on the Anne Arundel County charges. Bush's subsequent petition for certiorari to the Court of Appeals of Maryland was denied.

In the meantime, Bush's pending federal action had been transferred from the Eastern District of Virginia to the District of Maryland. In a letter to the clerk of that court on September 8, 1977, Bush sought to amend his original complaint to assert damage claims against the original defendants, Powhatan Correctional Center Superintendent Muncy and the Attorney General of Maryland, as well as others he sought to add as parties, including the Anne Arundel County prosecutor and those Virginia officials "who assisted in the deprivation of his rights."

Acting upon defendants' motion for summary judgment, on a record supplemented

by affidavits, the district court dismissed all Bush's claims. With respect to the habeas claim the court held that Bush had alleged no violation of federal law cognizable on a claim for that relief. Only Maryland law—its version of the IAD—was alleged to have been violated; as to that law the Maryland courts had the last word; therefore, even if Maryland's interpretation of that state law was erroneous, it was of no moment to the habeas claim which alleged no violation of federal law. With respect to the section 1983 claim, the court held that even if a violation of federally secured rights by the defendant Maryland and Virginia officials were alleged, those defendants were entitled as a matter of law to judgment by reason of prosecutorial and good faith immunity defenses.

Although the district court took notice of Bush's attempted amendment of his complaint by his letter of September 8, it never expressly ruled on this amendment. The reasons given by the court for its ultimate decision to dismiss all claims by Bush, however, clearly imply that the court felt that there was no defendant against whom, and no state of facts upon which, Bush validly could state a claim. This appeal followed.

The threshold question presented by the appeal is whether the IAD is federal law, the violation of which might be remediable under either 28 U.S.C. § 2254 or 42 U.S.C. § 1983. Assuming this question is answered in the affirmative, the issue then arises whether there was alleged a violation of the IAD in this case that might, in fact, entitle Bush to relief under either or both of those sections.

## II

### A.

Two decisions of the Supreme Court handed down since entry of the district court's judgment have now established that the IAD is federal law for purposes of section 1983. In *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Court held that 42 U.S.C. § 1983 provides relief for violations of federal statutory law as well as constitutional rights. In *Cuyler v. Adams*, 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981), it decided that, because the IAD is a compact among the states sanctioned by Congress under Art. 1, § 10, cl. 3 of the Constitution, it is a federal law whose violation may be remedied under section 1983.

■ *Thiboutot* and *Cuyler* therefore directly establish that violations of the IAD may give rise to claims for relief under 42 U.S.C. § 1983.[2]

---

**2.** There remains a threshold question not raised by the parties, whether the federal courts have jurisdiction to entertain such claims, based as they are, not upon the Constitution, but upon federal statutory law. Without specifically addressing the issue, the Supreme Court in *Cuyler* implicitly upheld jurisdiction by remanding for federal trial a claimed violation of the IAD by state officials. *Cuyler v. Adams,* 449 U.S. at 449, 101 S.Ct. at 712.

Were *Cuyler*'s implicit upholding of jurisdiction not considered authoritative, we would uphold it on an independent determination in this case.

There are two possible sources: 28 U.S.C. § 1343(3), the original jurisdictional counterpart of 42 U.S.C. § 1983; and 28 U.S.C. § 1343(4), enacted as part of the Civil Rights Act of 1957. The former confers jurisdiction in cases involving the violation of rights protected by the Constitution and by laws "providing for equal rights." The latter confers jurisdiction in cases involving violations of any "Act of Congress for the protection of civil rights." Be-

cause § 1983 is merely a remedial statute, it is not a law providing either "equal rights" or "civil rights." *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 615–20, 99 S.Ct. 1905, 1914–1917, 60 L.Ed.2d 508 (1979). In consequence, federal courts addressing a § 1983 claim of violation of federal statutory right must look to the particular statute to determine whether it is one protecting either "equal rights" per § 1343(3) or "civil rights" per § 1343(4). *Id.* at 620–23, 99 S.Ct. at 1917–1918. If it is not, jurisdiction lies only in the state courts. *See Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) (reflecting an incongruity between federal remedy and federal jurisdiction that was recognized and accepted in *Maine v. Thiboutot,* 448 U.S. at 8 n.6, 100 S.Ct. at 2506).

Therefore, were an independent jurisdictional inquiry needed here, it would turn on whether the IAD, which the *Cuyler* Court has held to be federal statutory law, may properly be considered a statute providing for equal or civil rights. While it is arguable that the jurisdic-

B.

The cognizability question with respect to the claim for relief under 28 U.S.C. § 2254 is more difficult. It has two elements: whether federal law by compact should under any circumstances be considered one of the "laws ... of the United States" contemplated by section 2254; and whether, if so, the particular violation of the IAD here alleged is a violation of that federal law for which relief under section 2254 may be had. On the first element, we agree with the Third Circuit that the same Compact Clause analysis that compels finding an interstate agreement to be federal law for section 1983 purposes compels finding it a law of the United States within the meaning of section 2254. *United States ex rel. Esola v. Groomes*, 520 F.2d 830, 840–42 (3d Cir. 1975) (Garth, J., concurring); *accord, Echevarria v. Bell*, 579 F.2d 1022, 1024–25 (7th Cir. 1978) (dictum).

The second element presents a more serious problem—one on which the circuits that have considered it are divided. The problem of course is that not all violations of the "laws of the United States" may be asserted in a habeas corpus proceeding. "[T]he appropriate inquiry [is] whether the claimed error of law [is] 'a fundamental defect which inherently results in a complete miscarriage of justice,' and whether '[i]t ... present[s] exceptional circumstances where the need for the remedy afforded by the writ of *habeas corpus* is apparent.'" *Davis v. United States*, 417 U.S. 333, 346, 94 S.Ct. 2298, 2305, 41 L.Ed.2d 109 (1974) (quoting

*Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962)).[3]

Applying the *Davis* standard to a variety of violations of the IAD, our sister circuits have reached conflicting results. Without detailed analysis, the Second Circuit has stated flatly that there is no "complete miscarriage of justice" and no "exceptional circumstances" inherent in a violation of the IAD and such a violation, therefore, may not be asserted as the basis for a claim under section 2255. *Edwards v. United States*, 564 F.2d 652, 654 (2d Cir. 1977) (per curiam) (return to sending jurisdiction before guilty plea in receiving jurisdiction). Similarly, the Eighth Circuit, noting that the prisoner had made no showing of harm in the litigation process, has held that "the mere failure to comply with the IAD, without more, does not justify relief under section 2255." *Huff v. United States*, 599 F.2d 860, 863 (8th Cir. 1979) (return before trial). Finally, the First Circuit has rejected the cognizability of an IAD violation in a habeas corpus proceeding, primarily because such a violation is not related to the guilt or innocence of the petitioner. *Fasano v. Hall*, 615 F.2d 555, 558 (1st Cir. 1980) (return before trial; failure to try within 180-day period).

On the other side lie the decisions of the Third Circuit in *Esola v. Groomes* and the Seventh Circuit in *Echevarria v. Bell* (return before trial). While in neither of these cases did the courts go past deciding, on a Compact Clause analysis, that the IAD was

---

tional predicate is supplied by either section, we think the stronger base is that provided by § 1343(4) and would rest jurisdiction upon its predicate of a "civil rights" violation. The provision of the IAD requiring trial within 180 days after demand by the prisoner on any outstanding charge for which a detainer has been filed, *see* 18 U.S.C. App. § 2, art. III(a), has appropriately been characterized as a statutory right to speedy trial. *See, e. g., Williams v. Maryland*, 445 F.Supp. 1216, 1222 (D.Md.1978). Moreover, the Act in its entirety has been recognized as providing a set of procedures for protecting a prisoner from the "undue and oppressive" incarceration that often results from an excessive delay in processing detainers. *See State v. Barnes*, 273 Md. 195, 203, 328 A.2d 737, 743 (1974). Viewed in this light, we think

that the IAD is certainly an act intended to protect "civil rights" and that, therefore, the federal courts have jurisdiction to decide a § 1983 claim arising from its violation under § 1343(4).

3. Both the Supreme Court's decision in *Davis* and a number of the decisions discussing the cognizability of a habeas corpus claim based on an asserted violation of the IAD have been made in the context of 28 U.S.C. § 2255 rather than § 2254. With the Third Circuit, we can perceive no difference in the statutory language of the two sections that would merit different treatment of a violation of the IAD. *See United States v. Williams*, 615 F.2d 585, 589 (3d Cir. 1980).

a "law of the United States" to consider whether a particular violation of that law met the Davis test of cognizability, the Third Circuit later addressed the question directly in *United States v. Williams*, 615 F.2d 585 (3d Cir. 1980) (arguably dictum). Considering the same violation of the IAD with which we are confronted in the present case—the failure of a receiving jurisdiction to try a prisoner on all outstanding charges before returning him to the sending jurisdiction—the *Williams* court noted that the sanction for that violation under the IAD is dismissal of the charges with prejudice. While recognizing that a violation of the IAD has "little if no [any?] bearing on the prisoner's guilt or innocence," the court nevertheless concluded that such a violation would be a "fundamental defect" that entitled the prisoner to habeas relief because the absolute defense to prosecution provided by the IAD when the Government violates the Act "is precisely the 'exceptional circumstances' making section 2255 relief appropriate." *Id.* at 590.

Both the Sixth and the Ninth Circuits have changed their original positions on this issue, but in opposite directions. Without expressly considering the *Davis* criteria the Sixth Circuit originally took the position that a violation of the IAD was remediable in a habeas corpus proceeding. *Stroble v. Anderson*, 587 F.2d 830, 840 (6th Cir. 1978) (failure to try within 120-day period). A divided panel of that circuit, however, has since held that a violation of the IAD was not cognizable in a section 2255 proceeding. *Mars v. United States*, 615 F.2d 704 (6th Cir. 1980) (return before trial and, *semble*, failure to try within 120-day period). Applying the *Davis* test, the *Mars* majority found that the petitioner was not entitled to relief because he had not shown that the claimed violation had "in any way affected or impugned the integrity of the fact finding process at his trial" or that the violation

had "caused him any actual prejudice." *Id.* at 707. The *Mars* court distinguished *Stroble* on the ground that the court in that case had not been presented with the cognizability issue. *Id.* at 707 n.9. Chief Judge Edwards, dissenting, thought that an affirmative decision on the cognizability issue was implicit in the *Stroble* court's holding that a violation of the IAD did entitle the petitioner to relief. *Id.* at 708–10.

The Ninth Circuit, on the other hand, originally held that a claim based on a violation of the IAD was not cognizable in a habeas proceeding. *Hitchcock v. United States*, 580 F.2d 964, 966 (9th Cir. 1978) (citing *Edwards v. United States*, 564 F.2d at 653) (return before trial). In reliance on the Third Circuit's discussion in *Williams*, however, the Ninth Circuit has now held that a violation of the IAD could be considered in a section 2254 action. *Cody v. Morris*, 623 F.2d 101, 102–03 (9th Cir. 1980) (failure to try within 120-day period). The *Cody* court distinguished *Hitchcock* on the ground that no violation of federal law had been shown in that case because no detainer had ever been filed. *Id.* at 103.

■■■ It is difficult to tell from these decisions whether the courts are holding, on the one hand, that any violation of the IAD for which dismissal of charges is the sanction constitutes a "fundamental defect" under the *Davis* test or, on the other hand, that no such violation does. Each of course deals only with specific violations, but the opinions going both ways may fairly be read to imply more general principles of total inclusion or exclusion. We expressly reserve decision on the broader question, and hold now only that a violation of the trial-before-return provisions of article IV(e) does not constitute a fundamental defect entitling a petitioner to habeas relief under section 2254.[4]

---

4. Specifically, we do not address the question whether a violation of the time limits for prosecution provided by art. III(a) and IV(c) of the IAD might be cognizable under § 2254, noting only that these involve different interests of the criminal accused than do the trial-before-return provisions of art. III(d) and IV(e). *See Wil-*

*liams v. Maryland*, 445 F.Supp. 1216, 1222 (D.Md.1978) (characterizing former as statutory right to speedy trial).

To the extent Bush's claim in the instant case might be read to charge a violation of the 120-day time limit of art. IV(c) as well as the trial-before-return provision of art. IV(e), it is

The strongest argument against this position is that of Judge Rosenn, writing for the Third Circuit in the *Williams* case. As he put it simply and directly, any violation of federal law for which the internally imposed sanction is dismissal of charges would seem to involve a "fundamental defect" leading to a "complete miscarriage of justice" and to present "exceptional circumstances" within the meaning of *Davis*. *Williams*, 615 F.2d at 590. While the force of this logic has to be recognized, we simply cannot accept its application to this particular violation of the IAD. Underlying the *Davis* Court's use of those particular terms in the quoted passage is the perception, we think, that only those statutory rights of a fundamental nature closely related to constitutionally secured rights to fair prosecution and adjudication should be subject to vindication by collateral review of criminal convictions. Though these may include other rights than those directly related to the establishment of guilt or innocence, we do not think they extend to non-traditional statutory guarantees—no matter how worthy of purpose—that are peripheral to the historic central concerns with fundamental fairness in the prosecutorial and adjudicative processes leading to criminal conviction and confinement.

As this court, *see United States v. Bryant*, 612 F.2d 806, 809–10 (4th Cir. 1979), and others, *see United States v. Chico*, 558 F.2d 1047, 1049 (2d Cir. 1977), have had occasion to observe, the trial-before-return provisions of the IAD are designed to encourage minimum interruption of rehabilitative programs at a prisoner's place of "original confinement" and to protect prisoners against harassment by uncoordinated shuttlings between states. This is a completely salutary purpose, presumably justifying imposition of the drastic sanction of charge dismissal as a means of insuring compliance with its terms by party state officials. As a provision of federal law, it is of course entitled to direct enforcement in any state criminal proceeding to which it properly applies. But because it does not involve any fundamental right historically considered critical to the protection of the criminal accused against unfair prosecution and trial by the state, we hold that, under *Davis*, it is not a violation subject to collateral review under 28 U.S.C. § 2254.

### III

#### A.

Having thus concluded that a violation of the IAD's trial-before-return provisions is not cognizable under section 2254, it is not technically necessary to address the alternative ground relied upon by the district court in denying habeas relief: that under Maryland's version of the IAD there had been no violation of this provision in any event. Because that was an alternative basis for the court's decision, however, and because of its serious implications for future enforcement of the IAD as "federal compact law" per *Cuyler*, we consider it appropriate to make these observations, though admittedly they are not necessary to decision.

As indicated, the district court considered that in assessing whether there had been a violation of Maryland's version of the trial-before-return provision of article IV(e) of the IAD, it was bound by the Maryland state court's interpretation of that provision, even if erroneous. *Bush v. Muncy*, No. K–77–1323, slip op. at 4 (D.Md. June 22, 1978). It is not altogether clear from the

without merit. Bush was first taken to Prince George's County for trial on November 17, 1975 at which time the 120-day period began to run under art. IV(c). He was not formally put to trial on the Anne Arundel County charges until July 13, 1976, a period considerably in excess of the 120-day period. But on the record presented, the running of the time period must be considered sufficiently tolled to avoid any violation of the 120-day period. Presumably at Bush's specific request, or in his interests because of a lack of counsel, his trial in Prince George's County was continued from November 24, 1975 to February 24, 1976. The 120-day limit must be considered tolled for this period, under art. IV(c) and VI(a). It must be considered further tolled under art. VI(a) for the period from April 13, 1976 to July 6, 1976 during which Bush was formally contesting his transfer from Virginia to Maryland for trial on the Anne Arundel charges.

district court's memorandum order whether it considered the whole of Maryland's version of the IAD to be state law, or only the critical supplementary provision directly relied upon by the Maryland court in finding no violation as to Bush. As developed in Part II.B. of this opinion, recent decisions have since definitively established that—in general terms at least—the IAD is federal law binding upon party states and their officials by virtue of the Compact Clause. *Cuyler v. Adams,* 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641; *United States ex rel. Esola v. Groomes,* 520 F.2d 830 (3d Cir.). *See also State v. Boone,* 40 Md.App. 41, 46, 388 A.2d 150, 153 (1978) (Supreme Court recognized as "final arbitrator of interstate compacts"; hence of Maryland's version of one of IAD's common provisions).

There remains the question, however, whether and to what extent, if any, a party state may as a matter of state law modify the Agreement in particulars applicable only to itself and its officials. That question—apparently one of first impression—will have now to be faced by any court, state or federal, hereafter confronted with such provisions when they are dispositive of claims advanced under the IAD. Neither *Cuyler* nor any other of the relatively few decisions of the Supreme Court establishing our meagre Compact Clause jurisprudence[5] have given a definitive answer.

■ Analysis to resolve that issue must start with the following principles that do seem firmly established in Compact Clause doctrine in general and as particularly applied to the Interstate Agreement on Detainers. First, under the *Cuyler* Court's analysis, the IAD was "transformed" into federal law by, and no later than the date of, its adoption by the second of two party states. *See Cuyler v. Adams,* 443 U.S. at 438, 101 S.Ct. at 707; *cf. United States ex rel. Esola v. Groomes,* 520 F.2d at 841 (Garth J. concurring) (federal law from date of prior approval by Congress). And from the date of its "transformation," *see Cuyler v. Adams,* 449 U.S. at 438 & n.7, 101 S.Ct. at 707 & n.7, its interpretation and construction presented federal, not state questions. *See Petty v. Tennessee-Missouri Bridge Comm'n,* 359 U.S. 275, 278, 79 S.Ct. 785, 788, 3 L.Ed.2d 804 (1959); *West Virginia ex rel. Dyer v. Sims,* 341 U.S. 22, 28, 71 S.Ct. 557, 560, 95 L.Ed. 713 (1951). *See also State v. Boone,* 40 Md.App. 41, 388 A.2d 150.

■ Second, once it became federal law, it lay beyond the judicial power of any party state to declare the Agreement not binding upon the state, even on state constitutional grounds, *West Virginia ex rel. Dyer v. Sims,* 341 U.S. at 28, 71 S.Ct. at 560, and its provisions, interpreted as federal law, must prevail over any existing or subsequently created provisions of state law in direct conflict, *Delaware River Joint Toll Bridge Comm'n v. Colburn,* 310 U.S. 419, 429–30, 60 S.Ct. 1039, 1041–1042, 84 L.Ed. 1287 (1940).[6]

These principles do not touch directly upon two problems presented in the instant case that simply have not arisen in the Supreme Court Compact Clause cases. The first involves identifying the precise text of federal compact law where, as here, the compact is created through a process of prior nonspecific congressional approval, followed by promulgation of a proposed agreement by a nongovernmental entity, followed by the sequential adoption of the proposed agreement by the requisite number—two—of party states, then by others. *See Cuyler v. Adams,* 449 U.S. at 438, 101 S.Ct. at 707 (discussing process by which prior approved agreement between states is

5. *See generally* Engdahl, *Construction of Interstate Compacts: A Questionable Federal Question,* 51 Va.L.Rev. 987 (1965); Frankfurter & Landis, *The Compact Clause of the Constitution—A Study in Interstate Adjustments,* 34 Yale L.J. 685 (1925).

6. Mainly relying upon *Colburn,* a United States district court of this circuit has recently held that the provisions of another interstate compact to which Maryland is a party state must prevail over a conflicting provision in that state's constitution. *Washington Metropolitan Area Transit Authority v. One Parcel of Land in Montgomery County, Maryland,* 490 F.Supp. 1328 (D.Md.1980) (arguably dictum: no direct conflict between constitution and compact).

transformed into federal law under Compact Clause). The precise text of federal compact law has not been a question in earlier cases because in each of them a specific text negotiated by party states— and ordinarily later embodied in reciprocal legislation—had been approved by Congress either before, *e. g., Petty v. Tennessee-Missouri Bridge Comm'n,* 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (semble) or after, *e. g., Delaware River Joint Toll Bridge Comm'n v. Colburn,* 310 U.S. 419, 60 S.Ct. 1039, 84 L.Ed. 1287, the enactment of legislation by which party states "joined" the compact. In this case neither of these patterns is involved, because here Congress approved the compact before any precise text had been formulated, and the member states then sequentially and independently adopted a text provided by an independent source, rather than framing it by negotiation and reciprocal legislation. *See Cuyler v. Adams,* 449 U.S. at 450–455, 101 S.Ct. at 713–715 (Rehnquist, J., dissenting).

The second problem inevitably arises from the first and from the nature of this pattern: with text of federal law established, to what extent, if at all, may it be varied by unilateral action of member states, either in conjunction with or independently of their entry into the Agreement?

■ On the problem of text, we conclude that the only logical answer is that federal law encompasses the nine numbered articles, I–IX, of the Agreement, *see* 18 U.S.C. App. § 2, as originally proposed by the Council of State Governments, *see* note 1 *supra,* for adoption by party states and then included in the enacting statutes of all in due course.[7] Technically, under the *Cuyler* Court's analysis, *see Cuyler v. Adams,* 449 U.S. at 438, 101 S.Ct. at 707, this text became fixed as federal law upon its adoption by the second member state to do so, though the exact date of that event is of no consequence here.

■ From this follows our second conclusion that under the Supremacy Clause, *see West Virginia ex rel. Dyer v. Sims,* 341 U.S. at 32–33, 71 S.Ct. at 562–563 (Reed, J., concurring), no party state has the power— either in conjunction with or independently of its entry into the Agreement—to alter in any substantial way any of its provisions governing the intended operation of the IAD between party states. Whether a particular enactment has that prohibited effect is, of necessity, itself a federal question, *see Petty v. Tennessee-Missouri Bridge Comm'n,* 359 U.S. at 278–79, 79 S.Ct. at 788, on which the federal courts have the final word without regard to any prior decisions by courts of the party state purporting to interpret or apply the provision in question. *See West Virginia ex rel. Dyer v. Sims,* 341 U.S. at 30–32, 71 S.Ct. at 561–562. This is so because in assessing the intended effect of this or any other constitutional compact, the courts are "called on to interpret not

---

7. In conjunction with its promulgation of the proposed Agreement, the Council of State Governments prepared a "Suggested Enabling Act" with a related commentary that refers to these articles as the "exact text of the Agreement on Detainers" which should be inserted as the body of Section 1 in any member state's adopting statutes. Council of State Governments, *The Handbook on Interstate Crime Control,* 117–23 (1978). Though a detailed review might reveal some minor variations in the party states' version of this text, it appears from a general inspection of the enacting statutes that the practice has indeed been to adopt it verbatim from the Suggested Enabling Act. In the course of his Compact Clause analysis in *Esola,* which was followed by the Supreme Court in *Cuyler,* Judge Garth assumed for purposes of that analysis "that the enactment of the Agreement by each party state is undoubtedly in

identical statutory terms." *United States ex rel. Esola v. Groomes,* 520 F.2d at 841 n.3 (Garth, J., concurring). Within this circuit, that is the case. *See Md.Ann.Code,* Art. 27, §§ 616B–616J; *N.C.Gen.Stat.,* § 15A–761; *S.C. Code* § 17–11–10; *Va.Code,* § 53–304.1; *W.Va. Code,* § 62–14–1. That the party states have themselves intended and understood this to be the condition upon which they were joining is reflected in the enacting clause proposed by the Council of State Governments and used in variant form by practically all states: "The Agreement on Detainers is hereby enacted into law and entered into by this state with all other jurisdictions legally joining therein in the form substantially as follows. * * * [Here insert exact text of Agreement on Detainers ...] * * *." Council of State Governments, *supra* at 117. *But see Md.Ann.Code* art. 27, § 616A.

unilateral state action but the terms of a consensual agreement ... made by different States acting under the Constitution and with congressional approval." *Petty v. Tennessee-Missouri Bridge Comm'n*, 359 U.S. at 279, 79 S.Ct. at 788. This must mean that what the party states corporately have intended in respect of their reciprocal obligations and dependencies under such a compact rather than what any party state unilaterally may have intended defines the federally based rights and duties created. In consequence, any unilateral attempt by a party state substantially to alter the intended operation of the compact as determined by looking to the "terms of [the] consensual agreement," *id.*, must yield under the Supremacy Clause.

8. The "Suggested Enabling Act" proposed by the Council of State Governments includes eight sections, 2–9, to follow section 1 containing the text of the Agreement. These define terms in the Agreement, direct and authorize compliance by state officials, exclude coverage with respect to particular offenses, provide for an effective date, etc. *See* Council of State Governments, *supra* note 7, 117–18. Obviously none of these substantially affects any fundamental provision of the Agreement itself, so that local adaptations confined to these suggested topics are perfectly compatible with a mutual intention of party states that the substantive provisions of the compact shall be identical in substance and hence subject to uniform application among all the parties.

Every party state has, of necessity, enacted variants of some or all of these housekeeping and administrative sections. Under the catchline—"*Supplemental Provisions*"—Maryland enacted five of the suggested provisions, *Md. Ann.Code* art. 27, §§ 616K–616O, and added three of its own: § 616P, excluding defective delinquents from the Agreement's coverage, § 616Q, the supplementary provision here in question, and § 616R, providing for the determination of credit for time served while in the custody of another party state.

9. § 616Q. Notice not deemed to have been given until actually received.

As to any request by a person imprisoned in another party state for trial in this State, written notice shall not be deemed to have been caused to be delivered to the prosecuting officer and the appropriate court of this State in accordance with § 616D(a), (Article III of the Interstate Agreement on Detainers), nor shall notification be deemed to have been given in accordance with §§ 616D(d) or 616E(b), (Articles III and IV of the Interstate

We need go no further with these observations than to note that under the foregoing analysis, the effect of Maryland's "supplementary" provision,[8] *Md.Ann.Code* art. 27, § 616Q [9] was and remains a question of federal law rather than—as both the Maryland court on Bush's direct appeal [10] and the district court on his section 2254 petition treated it—one of state law. That question, precisely, was whether the provision substantially altered the operation of article IV as intended by the compacting states when it became federal law, or whether, on the contrary, it merely clarified or expressed that intended meaning. If the former, it could not stand as federal law,[11] if the latter, it would.

Agreement on Detainers), until such notice or notification is actually received by the appropriate court and by the appropriate State's attorney of this State, his deputy, an assistant, or any other person empowered to receive mail on behalf of the State's attorney. (1965, ch. 627, § 1.)
*Md.Ann.Code* art. 27, § 616Q.

10. While § 616Q was not expressly referred to by the *Bush* state court, its provisions obviously underlay the court's holding that because "the Virginia officials did not comply with the express terms of the Act, ... the provisions of the Act ... simply did not come into play." *Bush v. State*, slip op. at 4. The court relied directly upon *King v. State*, 5 Md.App. 652, 662–63, 249 A.2d 468, 476 (1969), a case applying comparable provisions of Maryland's *intra-state* agreement on detainers and finding that agreement not triggered by reason of a similar failure of actual notice. The *Bush* court held that the interpretive rule of *King* was "equally applicable to the Interstate Agreement on Detainers." *Bush v. State*, slip op. at 5.

11. Any possibility that a party state's invalid effort unilaterally to alter the Agreement in the act of joining it might completely have nullified that act is avoided by the severability clause contained in the Agreement. 18 U.S.C.App. § 2, art. IX. The options apparently available to states with respect to the IAD are therefore to join "in substantially the form" of the Agreement; to decline to join at all; or completely to withdraw after having joined, *see* 18 U.S.C. App. § 2, art. VIII. Although the United States—not a "party" to the *constitutional* compact—specifically retained the right to "alter or amend" as well as to "repeal" the Act by which it joined the Agreement, 18 U.S.C.App.

The answer to that difficult question [12] we need not seek on this appeal, in view of our disposition of the section 2254 claim on other grounds. But whatever its difficulties and those presented by comparable "supplementary" state provisions, they will now have to be addressed by all courts required to apply them as parts of the federal law by compact embodied in the IAD. By this means, presumably, the IAD will over time be subjected to the uniform interpretation which, as federal law, it must be given.

### B.

We turn finally to the claimed violation entitling Bush to relief under 42 U.S.C. § 1983. Although the IAD is federal law for section 1983 purposes, *see* Part II.A. *supra*, state officials charged with its implementation are acting "under color of state law" in carrying out or omitting to carry out its provisions. *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 399–400, 99 S.Ct. 1171, 1176, 59 L.Ed.2d 401 (1979). Bush's claims against the Maryland and Virginia officials charged with proper implementation of article IV of the IAD, therefore, satisfy that predicate for section 1983 liability.

As earlier indicated, the district court granted summary judgment for the Maryland officials who failed, in alleged violation of article IV(e), to try Bush before his return to Virginia, on the basis that they had absolute prosecutorial immunity. We agree with that disposition. *Imbler v. Pachtman*, 424 U.S. 409, 427–28, 96 S.Ct. 984, 993–994, 47 L.Ed.2d 128 (1976).

This leaves the possibility of liability on the part of the responsible Virginia official or officials who failed, as required by article IV(b), to notify the Anne Arundel County authorities of Bush's imminent transfer for trial to Prince George's County. The Attorney General of Virginia first contends that this claim should be barred because Bush failed to assert it before the district court. Admittedly, Bush's only section 1983 claim against a Virginia official in his original complaint was one seeking to enjoin Powhatan Correctional Center Superintendent Muncy from transferring Bush to the custody of the Maryland authorities for trial on the Anne Arundel County charges. Upon the mooting of that requested relief by Bush's transfer to and trial in Anne Arundel County, however, Bush sought by letter to amend his original complaint to name as defendants the Virginia officials "who assisted in the deprivation of his rights" and to assert damage claims under section 1983 against all defendants. Although the district court noted this attempted amendment by Bush, it never expressly ruled on the proposed amendment, apparently on the assumption that its ultimate decision that all potential defendants were immune to monetary liability made such a ruling unnecessary.

■ Because we disagree, for reasons that follow, with that determination, Bush is entitled to have a ruling on the motion to amend. In view of the posture of the case, we undertake its resolution on the record before us. We hold that Bush's motion to amend should have been granted. His attempted assertion of a damage claim under section 1983 against Virginia officials did not become necessary until after his originally requested injunctive relief was mooted by his trial and conviction in Anne Arundel County. Thereafter, the motion was timely made and should have been granted under the provisions of Fed.R.Civ.P. 15.

§ 7, the amendment or alteration option is not available to party states in respect of fundamental provisions of the Agreement, for the reasons suggested in this opinion.

**12.** Essentially, the interpretive problem would be whether the compact states intended by enacting the interrelated provisions of article IV to assume fundamental reciprocal obligations and dependencies under which derelictions by the officials of one state could affect the obligations of another, or whether dependency and reciprocal obligations were intended to yield in the face of failures by one to take steps—here, to give actual notice—triggering obligations on the part of the other. If the former, then Maryland's attempt unilaterally to avoid the reciprocal dependency would not avail. If the latter, it would be valid as an express statement of the intended operation of the Act.

The Attorney General of Virginia next contends that all Virginia officials are immune to liability by virtue of the district court's summary judgment finding that all acted in "objective and subjective good faith." We agree that, as a matter of law on the summary judgment record, Powhatan Correctional Center Superintendent Muncy must be held to have acted in good faith in surrendering Bush to the custody of the Maryland authorities for trial in Anne Arundel County. He was, therefore, immune to any liability for that act, assuming without deciding that it constituted a violation of article IV(e). *Procunier v. Navarette*, 434 U.S. 555, 563, 98 S.Ct. 855, 860, 55 L.Ed.2d 24 (1978). On the present record, however, the same cannot be held in respect of the responsible Virginia official who committed a clear violation of article IV(b) of the IAD in failing to notify the Anne Arundel County authorities of Bush's transfer to Prince George's County. If that official is now identified and added as a party by the amendment here authorized, he may of course then plead and attempt to prove any good faith defense thought available. Obviously it cannot now be prejudged. *See McCray v. Burrell*, 516 F.2d 357, 370 (4th Cir. 1975). *See also Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) (good faith an affirmative defense to be *alleged and proved* by defendant in § 1983 action).

Having concluded that a genuine issue of fact does exist with respect to the possible section 1983 damages liability of some Virginia official or officials for violation of article IV(b) of the IAD, we must vacate the district court's grant of summary judgment for the Virginia defendants and remand for further proceedings. On remand Bush should be given the opportunity to discover the identity of the Virginia official or officials responsible for the failure to comply with article IV(b) of the IAD in his case and to amend his complaint to allege a claim against such persons as he contends are liable for violation of the federal rights here identified. Any defendants so joined may, of course, plead any good faith or other defense available to them.[13]

IV

The summary judgment in favor of all defendants on Bush's section 1983 claim is affirmed as to all Maryland defendants and as to defendant Muncy; it is vacated as to all other Virginia officials named or to be named as defendants and as to these defendants the action is remanded for further proceedings in accordance with this opinion.

The judgment denying habeas corpus relief under 28 U.S.C. § 2254 is affirmed.

In view of the dismissal of all claims against Maryland defendants, it may be appropriate upon remand to re-transfer the action to the Eastern District of Virginia. The district court may do so *sua sponte*, and shall do so upon the motion of any party in whose behalf or against whom any claim may now or later be pending in this action.

13. Without attempting a detailed chart of further proceedings on the § 1983 claim, we offer a brief observation on the compensatory damages that might be recoverable for any proven violation of the IAD provision here in issue. Only harm or injury proximately caused by any violation would, of course, be compensable. On that basis, Bush's trial and confinement on the Anne Arundel County charges is obviously not itself such an injury or harm, since the violation did not cause the trial or confinement that presumably would have resulted as well had the Act been followed. Only injury—physical, mental or emotional—related to the return to Virginia following the Prince George's County acquittal and before trial on the Anne Arundel County charges could have been proximately caused by the violation, and hence be compensable under § 1983. *See Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978); *accord, Burt v. Abel*, 585 F.2d 613, 616 (4th Cir. 1978); *cf. McCrary v. Runyon*, 515 F.2d 1082, 1089 (4th Cir. 1975) (compensable injury under 42 U.S.C. §§ 1981 & 1982).

This does not speak to the possibility of punitive damages, as to whose specific availability in this case we of course express no view. *See Carlson v. Green*, 446 U.S. 14 at 22 & n.9, 100 S.Ct. 1468 at 1473 & n.9, 64 L.Ed.2d 15 (1979); *Carey v. Piphus*, 435 U.S. at 257 & n.11, 98 S.Ct. at 1048 & n.11; *see also City of Newport v. Fact Concerts, Inc.*, —— U.S. ——, —————, ——, 101 S.Ct. 2748, 2759–2761, 69 L.Ed.2d 616 (1981).

AFFIRMED IN PART; REVERSED IN PART; REMANDED WITH DIRECTIONS.